IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

AUGUST 1996 SESSION



**FILED**

**June 17, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

STATE OF TENNESSEE,    )
                )
      Appellee,    )   No. 01C01-9511-CC-00392
                )
                )   Macon County
v.              )
                )   Honorable J.O. Bond, Judge
                )
PAUL RALPH LEATH,    )   (Three counts of rape of a child and two
                )    counts of aggravated sexual battery)
      Appellant.    )

For the Appellant:

Comer Donnell
District Public Defender

Howard L. Chambers
    and
Randy Wakefield
Assistant Public Defenders
213 North Cumberland Street
P.O. Box 888
Lebanon, TN 37087

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
    and
Karen M. Yacuzzo
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Tom P. Thompson, Jr.
District Attorney General
    and
John Wootten
Assistant District Attorney General
P.O. Box 178
Hartsville, TN 37074-0178

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Paul Ralph Leath, was convicted of three counts of rape of a child, Class A felonies, and two counts of aggravated sexual battery, Class B felonies. He received Range I, consecutive sentences of twenty years for each rape of a child conviction and ten years for each aggravated sexual battery conviction for an effective sentence of eighty years. In this appeal as of right, the defendant contends that:

> (1) the evidence is insufficient to support the jury's verdicts of guilt because the testimony was inconclusive as to when and how many times the events occurred;
>
> (2) the trial court erred by refusing to grant his motion for a change of venue because of the community-wide interest and the extensive media coverage;
>
> (3) the trial court erred by allowing inflammatory and prejudicial testimony concerning photographs when the defendant was not charged with a crime involving the pictures; and
>
> (4) the trial court erred in its application and consideration of enhancement factors and in imposing an excessive sentence of eighty years.

We hold that the evidence is sufficient to support the defendant's convictions. Although the trial court erred by failing to require the state to elect the offenses for which it was relying upon for convictions, we conclude that the error was harmless beyond a reasonable doubt. We also hold that the trial court did not err by denying a change of venue and by allowing testimony regarding photographs taken by the defendant. As to sentencing, we conclude that the trial court erroneously applied enhancement factors (2) and (16) to both convictions and enhancement factor (7) to the aggravated sexual battery conviction and failed to consider appropriate mitigating factors. However, we affirm the mid-range sentences imposed by the trial court and its order of consecutive sentencing.

2

In July 1993, Macon County Sheriff James Mercer began investigating the defendant and his wife, Judy Leath, for sexually abusing their six-year-old daughter, D.L. As a result of this investigation, the defendant was charged and convicted of committing three counts of rape of a child and two counts of aggravated sexual battery.

The then seven-year-old victim testified that she and her younger brother lived with the defendant and her mother. She stated that the defendant wore a skirt and a pair of high heels around the house. She said that the defendant also wore her mother's bathing suits and that she believed the defendant sometimes looked good in them. The victim testified that she normally slept in her bed but that sometimes she would get up and go into her mother's room where she either slept at the end of the bed or in her brother's baby bed that was in the room. She stated that the defendant, her mother and her brother usually slept in her mother's room. She said that the defendant either wore nothing to bed or one of his gowns or pajamas. The victim testified that she watched the defendant and her mother kissing or the defendant sticking his "tutu" in her mother. She said that the defendant and her mother talked to her while performing these sexual acts and that she got toilet paper for her mother because "stuff" would come out of her.

The victim testified that although she did not watch her parents a lot, she watched them more than once. She believed that they were having fun and stated that she thought it would be fun also. She stated that she asked the defendant to do to her what he had done to her mother. The victim testified that the defendant tried to stick his "tutu" in her when she was on her bed, when she was on the floor, when she was in a chair, and sometimes when she was in her mother's bed. She stated that the defendant tried more than once each time and that it hurt every time. The victim said that the defendant stopped when she told him it hurt. She stated that the defendant's "tutu" went inside her "tutu" a little the last time the defendant tried to stick it in her. She

3

testified that her mother was in the kitchen cooking or at work while these things were happening but that sometimes she told her mother what the defendant did.

The victim testified that the defendant also put his "tutu" in her mouth, and she stated that it was her idea. She said that when she asked him, the defendant told her she could. She stated that this occurred four or five times and that it happened at night when she was in a chair in the kitchen. The victim testified that her mother was asleep in bed. She said that the defendant was not wearing any clothes and that she was either sitting in the floor or in the defendant's lap. She also said that she would get up out of her bed and go into the kitchen and get in the defendant's lap. The victim testified that the defendant told her not to tell anyone anything. She stated that she kept it a secret until Lois Gregory from the Department of Human Services asked her about it. The victim testified that she realized that what she was doing was wrong because her mother told her it was wrong.

The victim also testified that the defendant and her mother took pictures around the house. She said that the defendant took pictures of her and her mother and that sometimes she would not be wearing any clothes.

On cross-examination, the victim testified that the defendant was nice to her. She stated that any time it hurt, she told the defendant, and he stopped. She said that she still loved the defendant and her mother.

Sheriff James Mercer of Macon County testified that he began investigating the defendant after receiving information from Captain Duke Jones of the Lafayette Police Department. He said that they talked to a couple of people regarding the information that they had received, and they ultimately spoke to Judy Leath, the defendant's wife and the victim's mother. Sheriff Mercer stated that after talking to Mrs. Leath, they went to the defendant's residence and brought the defendant to the station

4

for questioning. He said that the defendant signed a written waiver of rights and gave two taped statement to the officers admitting his guilt to the crimes, one on July 19, 1993, and another on July 20, 1993. Sheriff Mercer also testified that the defendant and his wife provided written consent to search their house on two separate occasions. He said that the defendant went with him each time the house was searched. Sheriff Mercer said that he took some items from the defendant's house, including a picture of the victim. He also testified that Larry Britton, a television news reporter, showed up at the jail while he was booking the defendant. Sheriff Mercer stated that the defendant gave a videotaped statement to Mr. Britton while he was fingerprinting the defendant. The defendant's taped statements and the videotape of Mr. Britton's interview of the defendant were introduced as exhibits and played for the jury.

The defendant's first taped statement reflects that he told the officers that the victim had played with his penis while he was lying on his bed in the nude. When asked whether he had ever licked the victim in her private parts, the defendant responded affirmatively. He said that he had also taken the head of his penis and rubbed it through the victim's private parts. The defendant said that it had not been long since this happened and that it occurred on two or three occasions. The defendant expressed the belief that the victim enjoyed it, and he told the officers that the victim was the one who started it in the first place. He denied penetrating the victim with his penis or his finger. The defendant said that the victim called his and her private parts "tootie."

The defendant stated that the victim had "caught" him and his wife having sex on earlier occasions. He said that when the victim asked what they were doing, he told her they were cuddling up. The defendant also said that the victim "caught" him walking out of a room nude, but he denied that it routinely happened. The defendant told the officers that he occasionally wore women's clothing in front of his children. He

5

also said that he had pornographic material in his bedroom but that the victim did not know that it existed. The defendant stated that the victim asked him to do things such as lick or play with her "peetie." The defendant claimed that he did not ask the victim to do these things and that he did not instigate the victim's conduct. He said that he did not say anything one way or another. The defendant told the officers that Mrs. Leath knew that the events took place although she was not in the room when they actually occurred. He said that their three-year-old son also was not present.

The defendant told the officers that the events had not occurred lately because the victim had "hot-cold spells" where she would go approximately one week without saying anything. He said that on the first spell, he told the victim that he was busy and that she should go to bed. The defendant stated that he did not know when the first incident took place but that it had been approximately two weeks since the last incident occurred. He said that the victim sometimes talked like a sixteen-year-old rather than a six-year-old, but he claimed that the victim did not learn these things at home. He told the officers that it was possible that the victim was sexually active.

The defendant also asserted that he did what he did because he wanted to keep the victim satisfied within the boundaries of his home to prevent her from getting a venereal disease from a stranger. The defendant stated that "more actually happened here than there." He claimed that initially he went along with it to keep the victim from seeking her satisfaction somewhere else and becoming physically injured. He said that a couple of times, he and his wife discussed what could be done with their daughter within the confines of the home, and he stated that they did not know who they could turn to for help. The defendant suggested that therapy was needed for the victim "to see what makes her tick," and he told the officers that if everything was kept quiet, there would not be a problem. Regarding his conduct, the defendant said that he

6

did not feel it was totally right but that he did not know who to ask for therapy to keep the victim quieted down.

The defendant's second taped statement reflects that the defendant admitted that the victim had kissed his penis and put it in her mouth for about five seconds "two, maybe three times" over a four to seven day period. He said that the oral sex occurred no more than three times and that it had been over one month or five weeks since the last incident took place. He claimed that the victim did it on her own without him asking her to do it. The defendant said that it took place in the victim's bedroom while he was lying on her bed asleep. He stated that he was asleep on the victim's bed because his wife and children had fallen asleep on his bed, and he said that the victim came into the room. The defendant admitted that he took some of the pictures that the officers found in a drawer in his bedroom, including a picture of the victim with her legs spread open. He said that the victim saw the picture and told him that it was a good picture. The defendant told the officers that he did not know whether the victim saw the picture he took of his wife. He also said that he did not know whether the victim had seen the magazines, movies or other photos taken from his house. The defendant told the officers that he did not know whether the victim had observed him and his wife engaging in similar sexual acts, but he denied performing oral sex with his wife in front of the victim. The defendant conceded that the victim may have seen him licking his wife.

The videotaped interview of the defendant by Mr. Britton shows that the defendant told Mr. Britton that he had gotten himself into a mess by being stupid. He said that he was only doing it to please his daughter and that the victim told him that it made her happy. The defendant claimed that his daughter led him into it and that it was a "spur of the moment thing" that he did not really think about at the time. He stated that he did not force the issue. The defendant asserted that he did not know

7

why the victim wanted to do these acts and that he did not know whether she had had sex with anyone. He told Mr. Britton that the events occurred for a few days and that it had been approximately six weeks ago since the last incident occurred. The defendant conceded that he took one of the pictures with her legs spread apart, but he claimed that he did not take the other pictures.

On cross-examination, Sheriff Mercer testified that the defendant was cooperative. He said that the defendant helped him locate things when he searched the defendant's house. He stated that the defendant told him and Mr. Britton that his sexual relations with his daughter ended before the investigation began. Sheriff Mercer testified that news reporters had been to the station and videotaped in the jail once before. He admitted that Mr. Britton may have seen some of the evidence in the case while at the jail because he questioned the defendant about the photographs and other items taken from the defendant's house. Sheriff Mercer stated that he did not show Mr. Britton the photographs. He conceded that he spoke to the defendant's attorney regarding his concern about the defendant's mental condition because the defendant was not eating correctly and acted differently. He stated on redirect examination that the defendant was eating properly at the time of the trial.

## I. SUFFICIENCY OF THE EVIDENCE - ELECTION OF OFFENSES

The defendant contends that the evidence is insufficient to support the jury's verdict of guilt for three counts of rape of a child and two counts of aggravated sexual battery because the testimony is inconclusive as to when and how many times the events occurred. He argues that "it is material how many times the actions complained of happened and what actually happened." The defendant complains that from the evidence presented at trial, it is impossible to determine that the defendant committed three separate acts of rape of a child and two separate acts of aggravated sexual battery. The defendant asserts that the jury could not have determined which of

8

the defendant's acts constituted which convictions. He claims that the jury essentially found the defendant guilty of each charge without requiring specific proof for each conviction. In support of his claims, the defendant cites State v. Burlison, 501 S.W.2d 801 (Tenn. 1973), and State v. Shelton, 851 S.W.2d 134 (Tenn. 1993). In response, the state contends that the evidence is sufficient to support his convictions and that the failure to elect is harmless error because it can be concluded beyond a reasonable doubt that the jury's verdict for each count was unanimous. We hold that the evidence is sufficient and that the failure to elect is harmless beyond a reasonable doubt.

## A. SUFFICIENCY OF THE EVIDENCE

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In the light most favorable to the state, the evidence establishes that the defendant stuck his penis in the victim's mouth four or five times. It also shows that the defendant's penis slightly went inside the victim's vagina on one occasion when the defendant was attempting to stick his penis inside the victim. These facts prove beyond a reasonable doubt that the defendant penetrated the victim as defined in T.C.A. § 39-13-501(7). A rational trier of fact could have found the defendant guilty of three counts of rape of a child. The evidence also establishes that the defendant committed two counts of aggravated sexual battery. The defendant tried to stick his penis in the victim's vagina on four different occasions and on the last occasion, the defendant's

9

penis went inside the victim's vagina a little. The unlawful sexual contact occurred while the victim was on her bed, on the floor, on her mother's bed, and in a chair. On each occasion, the defendant tried to stick his penis inside the victim more than once. The victim also played with the defendant's penis while they were lying on the defendant's bed. Also, the defendant licked the victim's vagina. Based on these facts, the jury could rationally conclude beyond a reasonable doubt that the defendant committed three rapes of a child and two aggravated sexual batteries.

## B. ELECTION OF OFFENSES

In Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), our supreme court held that the submission of evidence of multiple rapes by the defendant upon the victim when each of the several rapes so proven would meet the allegations of the charge in the indictment made it "the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." Id. at 804; see State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994). The court gave three reasons for these requirements:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue; and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Id. at 803. Because the requirement that the state make an election of the particular offense for which it will rely on for each conviction is "fundamental, immediately touching the constitutional rights of the accused," id. at 804, election is required even if the defendant does not make a request.[1] See State v. Hoyt, 928 S.W.2d 935, 946

---

[1] We note that the defendant in this case did not request that an election be made, although he filed a motion for a bill of particulars. Before trial, the trial court denied the defendant's motion for a bill of particulars. In ruling on the motion, the trial court stated that the defendant was not entitled to more specific allegations because the indictment sufficiently informed the defendant of the offense for which he was indicted in that the term penetration was defined by statute and the indictment narrowed the offense to a period of two weeks to a month. In State v. Shelton, 851 S.W.2d 134 (Tenn. 1993), our supreme court recognized the importance of a bill of particulars in relation to the defendant's preparation of his defense, one of the reasons stated in Burlison for the election requirement. Id. at 137. However,

(Tenn. Crim. App. 1995) (trial court's failure to require the state to elect the offense for which it seeks a conviction when the proof requires an election is considered plain error). Moreover, "an appellate court's finding that the evidence is sufficient to support convictions for any of the offenses in evidence is an inadequate substitute for a jury's deliberation over identified offenses." Shelton, 851 S.W.2d at 138.

In Shelton, our supreme court noted that the risk to the defendant's ability to prepare and defend has been greatly obviated, as a practical matter, because of rules relating to discovery and bills of particulars. 851 S.W.2d at 137. The court also noted that the risk relating to double jeopardy has effectively been ended by the creation of the rule prohibiting a second prosecution for other similar offenses which are shown to have occurred within the time frame covered by the charging instrument in the first prosecution. Id. Although the court recognized that an election at the end of the state's proof does little to aid in defense preparation, it continued the requirements of election and jury unanimity instructions in order to protect the defendant's constitutional right to a unanimous jury verdict. Id.

The Shelton court viewed the most serious concern to be the state constitutional requirement that a criminal conviction be based only upon a unanimous jury verdict. Id. at 138. "A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." Id. at 137 (citing State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). With regard to jury unanimity, this court stated that:

> in cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure

---

the defendant does not raise as an issue on appeal the trial court's denial of the motion for a bill of particulars.

11

> that the jury understands its duty to agree unanimously to a particular set of facts. The assessment of this potential would involve consideration of the allegations made and the statutory offense charged, as well as the actual evidence presented.

Brown, 823 S.W.2d at 583.

In this case, the indictment was neither time nor place specific. The indictment charged the defendant with three counts of rape of a child, alleging in the first count that the offense occurred "between June 1 and July on the 15 day of 1993," in the second count that the offense occurred "on or between June 1 and July 15, 1993," and in the third count that the offense occurred "between the month of June and early July, 1993." The defendant was also indicted for two counts of aggravated sexual battery, alleging in counts four and five that the offenses took place "between June and early July, 1993."

Although the defendant was indicted for only three counts of rape of a child, the state introduced evidence of more than three penetrations by the defendant. The victim stated that the defendant stuck his penis in her mouth four or five times while she was in a chair in the kitchen at night. She also said that the defendant's penis went inside her a little the last time he tried to stick his penis inside her vagina. In a statement to Sheriff Mercer, the defendant conceded that the victim had performed fellatio on him, but he claimed that it happened no more than three times and that one incident occurred in the victim's bedroom. Each act by the defendant constituted penetration as defined in T.C.A. § 38-13-501(7) for a conviction of rape of a child. However, the trial court did not require that the state elect which offense they were relying on for each count in the indictment.

With regard to the charges of aggravated sexual battery, the state presented the victim's testimony that the defendant tried to stick his penis in the victim's vagina on the victim's bed, on the floor, in the chair, and on the defendant's bed. The

victim testified that the defendant's penis would not go inside even though the defendant made more than one attempt on each occasion. The defendant told Sheriff Mercer that he allowed the victim to play with his penis while he was lying on his bed. He also told Sheriff Mercer that he had licked the victim's private parts. He said that he had taken the head of his penis and rubbed it through the victim's private parts on two or three occasions. Under these circumstances, election was required.

We note that during closing argument, the prosecutor argued that the aggravated sexual batteries were established by the victim's testimony that the defendant tried to stick his "tutu" in her "tutu" while she was on the bed, while she was on the floor, and while she was in the chair. This limiting of the proof by the state does not satisfy the requirements of election. The trial court must require the state to elect at the close of its proof-in-chief. See Burlison, 501 S.W.2d at 804. Moreover, the indictment charges the defendant with only two counts of aggravated sexual battery, and therefore, the state's reliance on three instances of unlawful sexual contact is insufficient to satisfy the requirements of election under Burlison.

When charging the jury, the trial court instructed the jury that the three counts alleging rape of a child charged separate and distinct offenses as to each count. It told the jurors that they must decide each charge separately on the evidence and the law applicable to it. The trial court gave a similar instruction with regard to the two counts of aggravated sexual battery, and it instructed the jury that a total of five separate judgments or verdicts must be returned. The trial court gave another general jury instruction regarding the requirement of a unanimous verdict:

> The verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.

The record reflects that the jury returned separate verdicts of guilt on each charge.

The lack of indictment specificity and the evidence of multiple offenses warranted state election and an appropriate jury instruction under Shelton and Brown. In this case, the trial court's failure to require an election constituted error. However, the state's introduction of evidence of additional sexual offenses committed by the defendant did not violate the defendant's rights against double jeopardy. The defendant is protected from double jeopardy because he cannot later be prosecuted for conduct of the same nature as that charged in the indictment that occurred during the time alleged in the indictment. See Shelton, 851 S.W.2d at 137.

Moreover, the failure to elect can be harmless beyond a reasonable doubt in an appropriate case. See Shelton, 851 S.W.2d at 138. That is, the evidence may be of such a quality that no real risk of a patchwork verdict exists. Id.

In Shelton, the defendant was charged with one count of aggravated rape of one of his three step-granddaughters and two counts of aggravated sexual battery of the other two step-granddaughters. The victim of the aggravated rape testified in very general terms that the defendant digitally penetrated her and her two sisters on more than one occasion, but she described in detail one incident that occurred on her birthday when the defendant was partially successful at his attempt to penetrate the victim with his penis. Id. The medical expert testimony was that there were clear signs of sexual abuse. Id. The court determined that it was error for the trial court to fail to require the state to elect offenses but concluded that the Burlison error with regard to the aggravated rape count was harmless beyond a reasonable doubt because "the jurors must have considered the evidence of this particular incident in convicting the defendant of aggravated rape." Id.

With regard to the remaining two counts of aggravated sexual battery, the court held that the Burlison errors were not harmless beyond a reasonable doubt. Id. at

14

139. Important in this determination was "the nature of the evidence" presented with regard to each charge. Id. One victim testified that the defendant fondled her and digitally penetrated her on more than one occasion, but she did not differentiate one event from the others. Id. With respect to that victim, the medical expert only found evidence of irritation in the victim's genital area. Id. The court reversed the defendant's conviction because in "view of the nature of the evidence and the Burlison error resulting from the state's failure to elect," the convictions could not be sustained. Id. The other victim did not testify, and medical proof found no evidence of irritation or any other physical proof. Id. The only proof establishing the offense "was the brief and thoroughly non-specific testimony of the other two victims . . . ." Id. The court not only determined that there was a Burlison error but also concluded that the evidence was insufficient to sustain the conviction. Id.

We hold that the evidence in this case is of such a quality that there was no risk that the jury's verdicts were less than unanimous and that the failure to require election was harmless beyond a reasonable doubt. In this sense, the case is unusual in that there was no actual contest of the facts. The victim's testimony in this case specifically detailed the events that took place, and her testimony was direct, clear and certain. The defendant's statements to Sheriff Mercer and Mr. Britton reflect that the defendant readily admitted his unlawful conduct and provided them with details of unlawful sexual conduct with the victim in addition to those described by the victim. The defendant even gave a statement to a television news reporter regarding his unlawful conduct. Moreover, neither the defendant's cross-examination of the victim nor his development of the evidence related in any fashion to an attack on the victim's testimony about the nature, the number, or the location of the rapes or aggravated sexual batteries. In fact, the cross-examination of the victim consisted solely of general questions regarding to whom the victim spoke about the offenses and whether the defendant stopped when she told him it hurt. Furthermore, the defendant's closing

15

argument essentially requested that the jurors consider the evidence and render a decision based upon the evidence. In fact, we note that the defendant's brief also states that it is not his intention to assert "that nothing happened at the Defendant's home between himself and his daughter."

Also, as previously noted, the state identified four specific instances of aggravated sexual battery during its closing argument for which it relied upon for a conviction. In addition, defense counsel told the jury during closing argument that it must "look at all the facts as they were presented on each separate count and make an individual decision . . . and discuss each one of them separately, five decisions you have to make, five different counts." The trial court's instructions to the jury stressed its need to decide each charging count as a separate and distinct offense and to consider the evidence relative to each separate charge. Likewise, it gave the general instruction about the need for a unanimous verdict, and the jury returned verdicts for each individual count. Although an instruction on the requirement of jury unanimity, is "an inadequate substitution for Burlison's explicit requirement that the prosecution identify the specific offenses for which it seeks conviction," Shelton, 851 S.W.2d at 136, the fact that a jury unanimity instruction is given is relevant to the determination of whether a Burlison error is harmless beyond a reasonable doubt. We believe that the circumstances in this case totally negate any real risk that the jury was not unanimous in deciding whether three separate acts of rape of a child and two separate acts of aggravated sexual batteries occurred. We also believe that there was no risk that the jury would not be unanimous in relating the separate acts to separate charging counts.

We note that in Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996), the supreme court addressed in a post-conviction setting whether the petitioner received the ineffective assistance of trial counsel because counsel did not request that the state elect the particular offense upon which a conviction was sought. In Tidwell, the

16

petitioner was charged with fourteen counts each of rape, statutory rape, incest, and contributing to the delinquency of a minor, each type of offense occurring on a monthly basis over a fourteen-month period between December 1985 and January 1987. Each count alleged that the petitioner committed a specific offense on the "___" day of a named month. The proof showed that the sexual activity between the petitioner and the victim, including cunnilingus, fellatio, and vaginal intercourse, began in December 1985 and ended in January 1987, and that it occurred approximately once a week. The victim was not able to match a particular act to a specific time, either by date or by other reference. She described two discrete incidents with particularity as to the date and the type of sexual activity. Also, the petitioner confessed before trial that he had engaged in sexual intercourse with the victim and that the last incident occurred three days before his arrest.

The supreme court rejected the state's argument that "'jury unanimity is attained in such cases because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described.'" Id. at 501. The court reasoned that the "approach . . . is akin to a 'grab-bag' theory of justice." Id. It illustrated this theory by example:

> To illustrate the operation of this theory, in any given case the State could present proof on as many offenses within the alleged period as it chose. Because all such offenses will have been "proven," the jury may, in effect, reach into the brimming bag of offenses and pull out one for each count. Even when done by this method, the argument goes, each offense will have been proven beyond a reasonable doubt. We acknowledge that the illustration is an extreme one, but we think that it makes the point: such an approach is contrary to our law.

Tidwell requires that there be an "apparent means to differentiate among various counts of the same offense" and that the jury be able to match a specific conduct to a specific count. See Tidwell, 922 S.W.2d at 501.

17

Ultimately, the Tidwell court ruled that counsel performed deficiently and that the deficiency resulted in prejudice to the petitioner, depriving him of a fair trial whose result is reliable with regard to the convictions for which the proof was not specific. Id. at 502. The court stated that it was not comfortable with the reliability of the result reached in the trial because of the state's inability to match occurrences to those counts for which the testimony was non-specific. Id. In addition, there was an "absence of varying surroundings, events, or circumstances that could have lent a singular identity to each incident." Id. The court recognized its earlier ruling in Shelton, "'If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.'" Id. (quoting Shelton, 851 S.W.2d at 138). However, for three of the fourteen incidents for which Tidwell was convicted, the court held that the petitioner had failed to establish any prejudice. Id. The proof establishing these convictions consisted of the victim's testimony specifically detailing the dates and the nature of the offenses and the petitioner's confession that he engaged in sexual intercourse with the victim on a certain date. Id. at 499.

Also, this court has held that a Burlison error was not harmless beyond a reasonable doubt when the trial court failed to require the state to elect even though the defendant was indicted for only one count of aggravated rape and the proof established both oral and anal sex. State v. Clabo, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995). Before trial, the defendant initially denied all charges made against him but later admitted his guilt to other crimes for which he was later indicted, though he did not confess to committing the offense of aggravated rape. Id. at 201. Over the defendant's objection, the trial court permitted the state to introduce evidence of both forms of penetration. Id. at 205. Our court reasoned that the Burlison error was not harmless beyond a reasonable doubt because the state relied upon both the oral and the anal sex as proof of the aggravated rape. Id. The court also stated that the trial court instructed the jury to rely upon counsel's arguments for each side's theory of the case

18

and defined penetration as including both fellatio and intercourse.  Id.  Also important in this court's decision was the fact that although the indictment alleged that the defendant committed aggravated rape by anally penetrating the victim, the record did not demonstrate that the indictment was read to the jury or that the jury was aware of the state's reliance upon the anal intercourse.  Id.

We believe the facts of this case to be distinguishable from Tidwell and Clabo.  The facts of this case do not present a situation as in Tidwell where evidence of numerous instances of sexual conduct was introduced through testimony that was not specific with regard to date or other references.  In this case, the proof at trial was specific in terms of the nature and the location of each of the offenses, lending a singular identity to each incident similar to the offenses in Tidwell that were particularly described.  Here, the jury was able to distinguish between the various acts that occurred.  Also, unlike the defendant in Clabo, the defendant admitted his guilt to the crimes for which he was indicted.  The defendant's evidence lacked any potential of diminishing the quality of the proof.  Instead, the defendant's proof related to whether the defendant stopped when the victim told him it hurt.  The certainty and the quality of the evidence presented is of such a degree that the only rational conclusion is that the jury determined that all of the offenses were proven beyond a reasonable doubt.  In our view, the evidence does not warrant, beyond idle speculation, an inference that any juror had a reasonable doubt about any of the penetrations or unlawful sexual contacts occurring.  The risk of a composite jury simply did not exist under the facts in this case. Under these circumstances, the Burlison error is harmless beyond a reasonable doubt.

## II.  CHANGE OF VENUE

The defendant contends that the trial court erred by failing to grant his motion for a change of venue because of the community-wide interest and the extensive media coverage that caused him to be prejudiced and prevented him from

receiving a fair trial. The state responds that the defendant's claim is without merit because the defendant fails to allege and the record does not establish that the jury was biased or prejudiced against him. We agree.

A change of venue may be granted if it appears that "due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). The matter of a change of venue addresses itself to the sound judicial discretion of the trial court, and its decision must be respected absent an abuse of discretion. Rippey v. State, 550 S.W.2d 636, 638 (Tenn. 1977).

In State v. Hoover, 594 S.W.2d 743 (Tenn. Crim. App. 1979), this court set forth the relevant factors when considering a change of venue. The factors to be considered are as follows:

1. Nature, extent, and timing of pretrial publicity.

2. Nature of publicity as fair or inflammatory.

3. The particular content of the publicity.

4. The degree to which the publicity complained of has permeated the area from which the venire is drawn.

5. The degree to which the publicity circulated outside the area from which the venire is drawn.

6. The time elapsed from the release of the publicity until the trial.

7. The degree of care exercised in the selection of the jury.

8. The ease or difficulty in selecting the jury.

9. The venireperson's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.

10. The defendant's utilization of his preemptory challenges.

11. The defendant's utilization of challenges for cause.

20

12. The participation by police or by prosecution in the release of the publicity.

13. The severity of the offense charged.

14. The absence or presence of threats, demonstrations or other hostility against the defendant.

15. Size of the area from which the venire is drawn.

16. Affidavits, hearsay or opinion testimony of witnesses.

17. Nature of the verdict returned by the trial jury.

Id. at 746. For there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992).

Before trial, the defendant filed a written motion for a change of venue. As grounds for his motion, the defendant alleged that the media coverage of the offenses had been extensive. He argued that statements made by the defendant and comments made by law enforcement officials to the media and disseminated to the public were highly inflammatory and prejudicial to the defendant. The defendant claimed that the prejudicial information had been so widely communicated to the community that the defendant could not receive a fair trial.

The defendant attached to his motion a copy of three Macon County Times newspaper articles regarding the defendant's case. The first article, dated August 23, 1993, is titled "Second Appearance By Macon Man on Sexual Abuse Charges" and contains a picture of the defendant in handcuffs being led away by a deputy. The article details the charges filed against the defendant and Mrs. Leath. It discusses the defendant's and Mrs. Leath's bond status and also explains that the defendant had waived his right to a preliminary hearing and that the case would be bound over to the grand jury. The article reports that the defendant had been

21

transported to an out-of-town jail because Sheriff Mercer had received threats concerning the defendant. It also states that Mrs. Leath had filed for a divorce, alleging "'cruel and inhuman treatment' and 'irreconcilable differences.'" The article also reports that the divorce papers state that Mrs. Leath had been under the duress of the defendant and fears for her personal safety. It states that Mrs. Leath had requested custody of their children and had obtained a restraining order against the defendant.

The second article, dated October 14, 1993, reports that the grand jury returned a five-count indictment against the defendant, two counts of aggravated rape and three counts of aggravated sexual battery. The third article, published on December 16, 1993, reflects that a trial date had been set in the defendant's and Mrs. Leath's case. The article recounted the nature of the charges returned by the grand jury.

Instead of filing affidavits averring facts constituting the alleged undue excitement or other cause upon which the motion was based, see Tenn. R. Crim. P. 21(b), the defendant called witnesses at the hearing on the pretrial motions.[2] Macon County Executive Raymond Doyle Gaines testified that he had lived in the county for sixty-five years. He stated that the media coverage on the defendant's case was "quite extensive." He testified that the local newspaper was widely read in the community, describing the newspaper as being "almost a Bible." He said that he had heard several people talk about the case and that many expressed strong opinions that the defendant was guilty. County Exeuctive Gaines testified that he believed that it would not be favorable to the defendant to have the case tried in Macon County. He stated that he thought it would be difficult to find jurors who did not have any knowledge of the case, and he expressed the opinion that the defendant could not receive a fair trial in Macon County.

---

[2] The defendant's and Judy Leath's case had not been severed at the time of hearing on the pretrial motions.

On cross-examination, County Executive Gaines testified that among the sixteen thousand residents in Macon County, nine thousand were registered voters. He conceded that the county population had a good base from which to draw a jury. He also admitted that most of the discussion about the defendant's case took place a couple of months after the defendant was arrested. County Executive Gaines said that he had not heard or seen anything within the last two months. On redirect examination, he stated that he had heard some people say that the defendant ought to be castrated.

Ben Holder, the mayor of the city of Lafayette, testified that he had lived in Macon County since 1952. He said that he had read newspaper articles in the local paper and The Tennessean and that he had seen the news on television about the defendant's case during the summer. Mayor Holder stated that he did not recall a case where there had been more discussion than the defendant's case. He said that people talked about the case each time an article was in the newspaper. He testified that he had also heard people talk about the photographs taken of the victim. Mayor Holder stated that he heard people say that the defendant ought to be castrated and that they wished they were on the jury. Mayor Holder expressed the belief that it would be hard to obtain an impartial jury because many believed the defendant was guilty.

On cross-examination, Mayor Holder testified that most of the conversations regarding the defendant's case took place when the case broke. He said that he was not aware of any television coverage of the case since the case initially broke. He conceded that most of the newspaper articles related to the docketing of the defendant's case. On redirect examination, Mayor Holder estimated that he spoke to approximately four or five hundred people.

Chief of Police Buford Wix testified that he had lived in Macon County since 1973. He said that he had read the local newspaper articles, and he stated that

23

the newspaper had a fairly large circulation. He recalled hearing people talking about the defendant's case, describing the conversations as "restaurant gossip or rumors that float around through your community." Chief of Police Wix expressed the opinion that it would be hard to find jurors who did not have some knowledge of the defendant's case. He said that only one person had expressed an opinion about the case to him and that the person resided outside of Tennessee.

Macon County Sheriff James Mercer testified that he was the sheriff at the time the defendant was arrested. Sheriff Mercer stated that he removed the defendant from the local jail and sent him to Trousdale County for approximately four to six weeks because he received an anonymous phone call making a threat against the defendant. He said that he did not receive any more threats after the defendant returned to the Macon County Jail. He testified that he had heard some talk about the case. He said that he did not recall anyone expressing the opinion that the defendant was innocent, although he remembered hearing people state that they believed that the defendant was guilty.

On cross-examination, Sheriff Mercer testified that he would have removed any prisoner had the same threat been made against him or her. He also expressed the opinion that an impartial jury could be impaneled although it might take longer. On redirect examination, Sheriff Mercer conceded that he laid the pictures he obtained from the defendant's house on his desk, but he claimed that he did not lay them out for the news media to photograph. He admitted that he showed the photographs to other people not affiliated with law enforcement.

At the hearing on the pretrial motions, Mrs. Leath's counsel summarized the videotape that was shown on Channel Five. He said that the videotape shows Mrs. Leath being fingerprinted and answering the questions of Mr. Britton. He stated that the

24

videotape also shows nude pictures lying on a table. The defendant's counsel also told the court that the videotape shows the defendant being brought to the jail. He stated that the videotape was shown on television several times. Although the videotape was not attached to the defendant's motion or introduced at the hearing as an exhibit,[3] the trial court stated that it did not need to see the video but that it would assume that everything was true because the state did not object to what counsel said. The trial court recognized that the video was shown on television before it delayed its ruling on the motion until voir dire of the jury.

Voir dire was conducted by questioning two groups of twenty-five people with general questions about the case and by delaying specific questions regarding the publicity until the venire could be questioned on an individual or group basis. During the general questioning, a prospective juror was excused for cause because she knew the victim's foster parents. Another was excused because of her feelings regarding sex abuse cases. During the group questioning, a prospective juror was excused for cause because she worked on the case at the Department of Human Services. Another was excused because of his involvement with young girls and his personal feelings with respect to sexual abuse. Four prospective jurors who recalled seeing the defendant's interview on television were also excused for cause. One of those jurors recalled seeing the defendant on television admitting his guilt. Of the second group of twelve prospective jurors, five were excused for cause because they knew the victim, Mrs. Leath, or other state witnesses either personally or through a close relative. The trial judge excused four other prospective jurors because they saw the defendant make a statement on television.

The record reflects that several of the prospective jurors had either read the newspaper articles or seen parts of the television news report. However, the

---

[3] We note that a video similar to that described by counsel for the defendant and Mrs. Leath was introduced at the sentencing hearing.

prospective jurors stated that they could disregard what they heard, listen to the proof, and require the state to meet its burden of proof. Eight of the prospective jurors, four of whom ultimately sat on the jury and one of whom sat as an alternate juror, said that they had neither read any of the articles nor saw the news report on television, although some had heard other people talking about the case.

Initially, we note that the defendant does not assert that the prospective jurors who ultimately sat on the jury were biased or prejudiced against him. Instead, he contends that the trial judge's determination to try the case in Macon County is evident from the manner in which the judge questioned three prospective jurors in that he interrupted the questioning to explain the burden of proof or ask whether the juror could listen to the proof. However, none of these prospective jurors served on the jury. One of the prospective jurors was excused for cause and the other two were challenged. Moreover, the trial judge's questioning of the three jurors was proper.

With regard to the jurors who actually sat on the jury, the record does not establish that the jurors were biased or prejudiced against the defendant. We agree that the information contained in the articles regarding the defendant being moved to an out-of-county jail due to threats and Mrs. Leath's filing for divorce and obtaining a restraining order was prejudicial to the defendant. The videotape of the interview of the defendant was prejudicial as well. However, the defendant's trial was conducted on June 13, 1994, approximately ten months after the first newspaper article and the television news report and approximately six months after the last newspaper article. Furthermore, the jurors who had either read the newspaper articles or had seen part of the television news report stated that they could base their decision on the proof presented at trial and require that the state meet its burden of proof. Those jurors who had seen the interview of the defendant on television were properly excused. Moreover, four of the jurors and the alternate juror stated that they had not read or seen

26

anything regarding the defendant's case, although some had heard other people talking about the case. They too stated that they could be fair. Because the defendant has failed to establish that the actual jury was prejudiced, we hold that the issue is without merit. The trial court did not abuse its discretion by denying the defendant's motion for a change of venue.

### III.  INTRODUCTION OF TESTIMONY REGARDING PHOTOGRAPHS

The defendant complains that the trial court erred by allowing the admission of inflammatory and prejudicial testimony regarding photographs of the victim and her mother naked when the defendant was not charged with a crime involving the photographs. He argues that the crimes for which he was charged did not require a showing of the defendant's state of mind or intent. Although not raised as a separate issue or contained within the statement of the issue, the argument portion also includes a claim that the trial court erroneously allowed the state to introduce into evidence a photograph of the victim as Exhibit 9. He contends that the photograph is irrelevant and inflammatory and that the photograph is more prejudicial than probative, denying him his constitutional right to a fair trial. Initially, we note that the procedure used by the defendant, stating one issue in the statement of the issue but arguing another issue within the text of the argument, does not comply with the requirements of T.R.A.P. 27(a)(4) and (7). Nevertheless, the defendant is not entitled to relief on either ground.

The state responds only to the defendant's argument that the photograph was erroneously admitted into evidence, asserting that the record demonstrates that the state did not attempt to introduce any photographs at trial and that Exhibit 9 is a permission to search form, not a photograph of the victim. We agree.

Before trial, the defendant filed a motion to suppress the photographs claiming that the photographs were more prejudicial than probative under Rule 403,

Tenn. R. Evid. We note that the defendant's motion misstates the balancing test used for a Rule 403 analysis. Pursuant to Rule 403, Tenn. R. Evid., relevant "evidence may be excluded if its probative value is <u>substantially</u> outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added). The trial court delayed its ruling on the motion until trial.

During the direct examination of the victim, the prosecutor asked the victim whether the defendant and Mrs. Leath took nude pictures of her and of each other around the house. Defense counsel objected to the testimony concerning the pictures based upon its irrelevancy because the defendant had not been charged with a crime regarding the taking of the pictures. During a jury-out hearing, the prosecutor informed the trial court that it had approximately fifty pictures and that one of the pictures showed the victim's mother naked with her legs spread apart and another reflected the victim in a similar pose. The prosecutor stated that it did not intend to enter the photographs into evidence, and the trial court agreed that there was no reason to introduce them. Defense counsel said that his objection related to the fact that the defendant is not charged with a crime where intent is a necessary element and stated that he objected to the use of the pictures or any description. In response, the prosecutor argued that the testimony was relevant to rebut the defendant's claim that it was the victim's idea and not his.

The trial court ruled that the photographs themselves were inadmissible but that the state could elicit testimony from the victim concerning the defendant's taking pictures of the victim. The court reasoned that the testimony was not being introduced for the purpose of establishing the defendant's intent, but rather the testimony was relevant to show that the victim was accustomed to being naked and to show a pattern and design of conduct. The prosecutor then asked the victim whether

28

the defendant ever took pictures of her and whether she had her clothes on or off. The victim answered that the defendant took pictures of her and that she had her clothes on and off when he took the pictures.

During the direct examination of Sheriff Mercer, the prosecutor handed Exhibit Nine to Sheriff Mercer and asked him to identify it. Sheriff Mercer identified the exhibit as a permission to search. Sheriff Mercer then testified that he went to search the defendant's house a second time because he had received information that there were some pictures. The prosecutor asked Sheriff Mercer whether he found at least one picture of the victim, and the defendant objected, stating as grounds for his objection that he had not been charged with any crime involving the photographs. The trial court stated that it had earlier ruled that testimony about the picture of the child was admissible. Then, Sheriff Mercer testified that he found one picture of the victim, and the state entered Exhibit Nine into evidence.

Evidence that the defendant took a nude photograph of the victim was also introduced through the videotaped interview of the defendant by Mr. Britt. When asked whether he took any photographs of the victim, the defendant admitted that he took one picture of the victim with her legs spread apart. Although the proof does not show exactly when the picture was taken in relation to the charged conduct, the defendant told Mr. Britt that the sexual conduct took place only for a few days and that it had been approximately six weeks since the last incident occurred.

We note that when objecting to the introduction of testimony regarding the photographs, the defendant did not clearly articulate which rule of evidence he was relying upon for the exclusion of the evidence. The defendant phrases his argument on appeal in a similar manner. Although at first glance, his claim appears to be based solely upon relevancy under Rules 401, 402 and 403, Tenn. R. Evid., the defendant's

29

assertion that he was not charged with a crime involving the photographs relates more to the exclusion of prior bad acts under Rule 404(b), Tenn. R. Evid. A timely objection for purposes of preserving the issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context." Tenn. R. Evid. 103(a)(1). Although the defendant should have stated the grounds for his objection more clearly, we choose to address the issue on the merits.

Pursuant to Rule 402, Tenn. R. Evid., relevant evidence is admissible unless provided otherwise by constitution, evidentiary rule, or other Tennessee rule or law. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Our court has stated that "the trial court is entitled to draw upon common sense, general knowledge, and its understanding of human conduct and motivation in assessing whether evidence could reasonably affect an assessment of the probability of the fact to be inferred." State v. Hayes, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Whether to admit evidence is within the discretion of the court, and its decision will not be overturned absent an abuse of that discretion. State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994).

We hold that evidence that the defendant took nude photographs of the victim is relevant evidence under Rule 401, Tenn. R. Evid. The trial court's stated reason for admitting the evidence was to show that the victim was accustomed to being naked and to show a pattern and design of conduct by the defendant. We agree that the testimony was relevant for these purposes. Moreover, for aggravated sexual

battery purposes, the state was required to prove that the defendant's touching of the victim's vagina with his penis was intentional and for the purpose of sexual arousal or gratification. See T.C.A. § 39-13-501(6) and -504(a); Hayes, 899 S.W.2d at 183.[4] Although the trial court did not admit the evidence for purposes of establishing intent, we hold that evidence that the defendant took photographs of the victim is relevant to show the defendant's state of mind with regard to the aggravated sexual battery.

We also hold that the evidence was admissible under Rule 403 with respect to the aggravated sexual battery charges. We recognize that testimony that the defendant took nude photographs of the victim was prejudicial to the defendant's case in that the jury could have impermissibly inferred that because the defendant committed the uncharged acts, he also committed the acts for which he was on trial. See McCary, 922 S.W.2d at 515. However, the evidence was relevant to the issue of intent in light of the defendant's statement that his conduct was not for the purpose of gratifying his desire for pleasure or excitement. Also, the defendant told the television news reporter that the sexual conduct occurred over a few days and that it took place approximately six weeks earlier. Thus, the close proximity in time to the charged conduct increases the probative value of the evidence. Therefore, we conclude that the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice to the defendant.

The evidence was also admissible under Rule 404(b) with respect to the aggravated sexual battery charges. This rule provides a general prohibition for evidence of other crimes or acts that are independent of the offenses on trial in "recognition that such evidence easily results in a jury improperly convicting a defendant

---

[4] We note that language contained in McCary, 922 S.W.2d at 514, suggests that specific intent is not a necessary element of aggravated sexual battery. However, in an unpublished order on petition to rehear, our supreme court clarified that "specific intent is a necessary element of sexual battery and aggravated sexual battery." State v. Donald C. McCary, No. 03-S-01-9410-CR-00106, Hamilton County (Tenn. July 8, 1996) (Order Denying Petition to Rehear).

for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Rickman, 876 S.W.2d at 828. However, Rule 404(b) does allow such evidence when it is relevant to a litigated issue, such as, identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice. See State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987).

In this case, the defendant's taking of nude photographs of the victim qualifies as prior bad acts under Rule 404(b). See McCary, 922 S.W.2d at 513. As mentioned earlier, testimony about these acts was relevant to the issue of whether the defendant's touching was intentional for a conviction of aggravated sexual battery. In a similar case, our court has held that "given the timing of the defendant's acts and their relevance to the defendant's intent in touching the victim, we fail to see the existence of any unfair prejudice, as opposed to that prejudice which naturally flows from all admissible evidence and is intended to persuade the trier of fact." Hayes, 899 S.W.2d at 183 (admissible prior bad act evidence of the defendant french kissing the victim during the summer the defendant committed aggravated sexual battery). We also hold that the probative value of the evidence is not outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in permitting the testimony relative to the aggravated sexual battery charges.

However, with respect to the rape charges, the evidence of the nude photographs would be less probative relative to the elements required to be proven for the commission of the offenses. Intent is not an element of the crime of rape of a child. In McCary, our supreme court indicated that the three instances in which evidence of uncharged crimes may be admitted under Rule 404 -- (1) to prove identity (including motive and common scheme or plan), (2) to prove intent, and (3) to rebut a claim of

mistake or accident if asserted as a defense -- depend upon whether they are material issues in the given case. 922 S.W.2d at 514. In the present case, neither the offender's identity nor his intent were material issues relative to the offenses involving rape of a child. Likewise, the defendant did not claim mistake or accident relative to these offenses. Thus, the probative value of the evidence is substantially reduced in relation to the danger of unfair prejudice relative to the rape of a child offenses. We believe that the danger of unfair prejudice outweighs the probative value of the evidence for these particular offenses. See Tenn. R. Evid. 404(b). However, the trial court's erroneous admission of the evidence relative to the rape of a child offenses is harmless given the overwhelming proof of the defendant's guilt. See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

Regarding the defendant's claim that a picture of the victim was erroneously introduced at trial, we hold that the record clearly demonstrates that Exhibit Nine is in fact the permission to search form signed by the defendant on July 19, 1993. When asked to identify Exhibit Nine, Sheriff Mercer identified the exhibit as a permission to search form. We note that the Certificate of Appellate Record contained in the technical record reflects that Exhibit Nine is a photograph and that the original exhibit is contained in the appellate record of Judy Leath's case. However, a review of the appellate record in Judy Leath's case shows that Exhibit Nine is a permission to search form. Thus, the defendant mistakenly believed that the exhibit was a picture, and the trial court did not err.

## IV.  SENTENCING

The defendant asserts that the eighty-year sentence imposed by the trial court is excessive and unfair.  The defendant concedes that the trial court appropriately applied enhancement factor (15), but he asserts that the trial court should not have applied enhancement factors (2), (7) and (16) and that it improperly failed to consider any mitigating factors.  The defendant also contends that the trial court erroneously ordered the defendant to serve his sentences consecutively.  We hold that the trial court inappropriately applied factors (2) and (16) to all convictions and factor (7) to the rape of a child convictions.  We also conclude that the trial court failed to consider applicable mitigating factors.  We believe, however, that the mid-range sentences imposed by the trial court for each conviction are warranted in this case and that consecutive sentences are supported by the record.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct.  T.C.A. § 40-35-401(d).  As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper.  This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c).[5] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

At the sentencing hearing, Bill Hyden, a probation officer, testified that he conducted a presentence investigation. He stated that the victim and her brother had been placed in a foster home. Mr. Hyden said that during his interview of the defendant

---

[5] For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See T.C.A. § 40-35-210(c).

regarding the offense, the defendant was "bluntly assertive" and told him that he believed he was satisfying the victim's sexual desires. He stated that the defendant denied that he committed the crimes for his own desire for pleasure or excitement, claiming that he did it all for the victim. He said that he questioned the defendant about his remorse for committing the crimes, and the defendant told him that he would have done things differently if he had it to do over again. Mr. Hyden testified that the defendant did not express any concern for the victim and stated that it was obvious to him that the defendant had no remorse. He stated that the defendant also denied taking photographs of the victim and having pornographic movies. He acknowledged that a mental evaluation had been performed on the defendant before trial but that he had been determined to be competent to stand trial. Mr. Hyden testified that he believed the victim would have emotional and mental scars because she would remember what happened and people would ask her about it. He also believed that the potential for bodily injury to the victim was great based upon the victim's testimony that it hurt when the defendant tried to stick his penis inside her.

On cross-examination, Mr. Hyden acknowledged that the defendant did not have a prior criminal record. He also said that the defendant's mother and former employers expressed surprise by the defendant's conduct. In Mr. Hyden's opinion, the defendant appeared to be intelligent. He testified that the defendant acted like he believed that he did not do anything wrong. Mr. Hyden stated that he did not believe that the defendant was being remorseful when he told him that he would have done things differently. He conceded that he did not interview the victim or doctors, although he said that there were medical reports contained in the record.

The defendant testified that he was sorry about what happened. He explained that what he meant by the statement to Mr. Hyden that he would have done things differently was that it would not happen again because of what it had done to his

36

family. He said that it had torn his family apart. The defendant testified that the offense affected his children and caused the victim mental scars. He said that he worries about the victim. He stated that he wished that there was some way he could correct everything so that they could be a family once again.

On cross-examination, the defendant testified that the victim liked to see him wear women's clothing and that she admired him. He conceded that the victim had seen him and his wife having sex perhaps once or twice. He said that the victim left her bedroom and came and stood at their door but that he did not know if the victim was ever in the bed when he and his wife were having sex. The defendant said that he committed the offenses because the victim asked him to and because he wanted to make her happy. He testified that it does not necessarily mean that he would not do something like that again, although he claimed that he was sorry it happened. The defendant also claimed that everything was done totally for the victim and that it was not done for his own sexual gratification. He denied being aroused by the victim licking his penis. He said that he was playing with his daughter and doing what she asked him to do. The defendant admitted that he took separate pictures of his wife and the victim nude with their legs spread apart. He claimed that he took the picture of the victim because she asked him to, and he said that he did not take the pictures to satisfy his own desire for sexual gratification, asserting that he "just took the pictures."

The presentence report shows that the investigating officers discovered approximately fifty nude pictures under some clothes in a drawer in the defendant's bedroom. It reflects that the victim is living in a foster home and is undergoing counseling. The report states that the defendant, a high school graduate, does not have a prior criminal record. It reflects that the defendant is in good mental and physical health. The report contains a statement by the defendant's mother that the defendant was a good son as a child and that he never caused any trouble. The

37

defendant's mother stated that she believed that something went wrong with the defendant. Regarding the defendant's employment history, the presentence report shows that the defendant was employed from 1988 to 1993. It reflects that one of the defendant's employers who had known the defendant for more than thirty years stated that the defendant was a very good employee and that she was shocked by the defendant's conduct. The report states that the defendant volunteered for the United States Marine Corp in 1965, advancing to the rank of sergeant and serving thirteen months in the Vietnam War as a postal worker. It shows that the defendant received an honorable discharge in June 1969.

The state also introduced several photographs as exhibits at the sentencing hearing. Some of the photographs show the defendant and his wife naked in various sexual positions, and others are individual photographs of the defendant, his wife and the victim nude.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twenty years for each rape of a child conviction and to ten years for each aggravated sexual battery conviction to be served consecutively to each other for an effective sentence of eighty years. The trial court applied the following enhancement factors provided in T.C.A. § 40-35-114:

> (2) the defendant was a leader in the commission of an offense involving two (2) or more criminal actors;
>
> (7) the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;
>
> (15) the defendant abused a position of private trust; and
>
> (16) the crime was committed under circumstances under which the potential for bodily injury was great.

In applying factor (2), the trial court stated that the defendant's wife, who was also indicted, was in bed with the defendant and the victim. It concluded that the

38

factor applied based on the defendant's own testimony that the victim was in bed with him when he and his wife were having sex. The court stated that factor (7) applied based on its finding that the defendant was excited and had an erection when he tried to penetrate the victim. The trial court acknowledged that the application of factor (16) was a close issue but stated that it believed that the factor applied because the victim could have been severely injured by the defendant's actions. It stated that the fact that the defendant, a grown man, tried to put his penis in the six-year-old victim justified the application of the factor. It concluded that although the defendant did not succeed in penetrating the victim, the defendant tried to penetrate her and it could have caused great bodily injury, such as causing a tear or damaging the victim's internal organs. The trial court found that no mitigating factors applied.

> Regarding consecutive sentencing, the trial court stated:
>
> I have no problem making them consecutive. This man has no business ever being out where any child is in eye-shot of him. Where daughter wants it, that's unbelievable to this Court that anybody could have those feelings. To think a six year old girl could ask somebody to do this to her and try to put all the blame over on that little child. There's no remorse here. The only remorse that I get out of this is the remorse of being caught. I just get the feeling and watching him testify at the end, that if daughter asked him to do it again, in his mind, if he dreamed that up laying in bed one night, if he had a little daughter, little neighbor, or whatever child might be around, that little child would have some problems with this man.

The trial court stated that society needed to be protected from the defendant.

## A. ENHANCEMENT AND MITIGATING FACTORS

The defendant concedes that the trial court appropriately applied factor (15), abuse of a position of private trust. See T.C.A. § 40-35-114(15). We agree that the factor applies in this case because the defendant is the victim's father charged with her care and control. See Hayes, 899 S.W.2d at 187.

The defendant contends that factor (2) should not have been applied because the record does not contain any proof that anyone other than the defendant was present in the room when the offenses took place. The state argues that the trial court properly considered the factor because the defendant and Mrs. Leath permitted the victim to watch them have sex. It contends that the factor is supported by proof that Mrs. Leath was present in the house when some of the offenses occurred and that the victim told Mrs. Leath about the defendant's conduct. However, Mrs. Leath's mere presence in the house and notification of the offenses after-the-fact do not justify the application of factor (2). The victim testified that Mrs. Leath was either in the kitchen, at work, or in bed when these offenses occurred. Moreover, contrary to the trial court's findings, the record does not contain any evidence that the victim was in the defendant's bed when the defendant and Mrs. Leath were having sex. The record does not support the trial court's determination that the defendant was a leader in the commission of the offenses of rape of a child and aggravated sexual battery. Therefore, the trial court should not have applied factor (2).

Relative to factor (7), the defendant argues that there is nothing in the record to show that the defendant committed the offenses to gratify his desire for pleasure or excitement. See T.C.A. § 40-35-114(7). Initially, we note that a necessary element of aggravated sexual battery is sexual contact which is defined as the intentional touching of an intimate part of the clothing over such part "for purposes of sexual arousal or gratification." T.C.A. § 39-13-501(6); see State v. Kissinger, 922 S.W.2d 482, 489-90 (Tenn. 1996); Hayes, 899 S.W.2d at 185. Because a factor cannot be applied if it is also an essential element of the offense as charged in the indictment, T.C.A. § 40-35-114, factor (7) is inapplicable to the aggravated sexual battery convictions.

40

However, factor (7) is not an essential element of aggravated rape and may be considered as an appropriate enhancement factor. State v. Adams, 864 S.W.2d 31, 34-35 (Tenn. 1993). In this case, the trial court ruled that factor (7) applied because the defendant was excited as evidenced by his having an erection. However, the record does not contain any evidence that the defendant had an erection other than the victim's testimony that it hurt when the defendant tried to stick his penis inside her vagina. Moreover, even if the evidence showed that the defendant had an erection, it would not, alone, justify a determination that factor (7) applied. See Kissinger, 922 S.W.2d at 490-91. In Kissinger, our supreme court held that the fact that the defendant experienced orgasm is insufficient, in and of itself, to establish that the defendant committed rape to gratify his desire for pleasure or excitement. Id. at 490-91. It recognized the difficulties in establishing factor (7):

> Enhancement factor (7), unlike most of the other sentencing factors, calls into question a defendant's reasons for committing a crime. Human motivation is a tangled web, always complex and multifaceted. To prove defendant's motives will always be a difficult task. But the legislature, in its wisdom, has placed that obligation on the state when the state seeks an enhanced sentence.

Id. The court ruled that the fact of orgasm must be viewed along with other circumstances in the case. Id. at 491.

However, unlike Kissinger, the circumstances in this case render factor (7) applicable. Despite the defendant's denial that he committed the offenses to gratify his own desire for pleasure or excitement and his claim that he acted as he did only because the victim requested, the evidence supports the application of factor (7) by a preponderance of the evidence. See State v. Carter, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995) (preponderance of the evidence standard applies to factual determinations necessary for enhancement factor). There were several instances of sexual conduct by the defendant with the victim occurring on different occasions. The defendant penetrated the victim by inserting his penis in the victim's vagina. The victim

41

performed fellatio on the defendant on more than one occasion. The defendant licked the victim's vagina and allowed the victim to play with his penis. Moreover, the defendant talked to the victim while he was having sex with Mrs. Leath, and he took a photograph of the victim who was not wearing any clothes and posing in a similar position as a picture taken by the defendant of Mrs. Leath. Furthermore, the jury concluded beyond a reasonable doubt that the defendant's intentional touching was for the purpose of sexual arousal or gratification to convict the defendant of two counts of aggravated sexual battery. Under these circumstances, we hold that the record supports the application of factor (7) in sentencing the defendant for the rape of a child convictions.

Relative to factor (16), the defendant asserts that the record does not support the application of the factor. We agree. Although the partial penetration and the attempted penetrations of the six-year-old victim by the defendant, a grown man, could have created the potential for bodily injury, the record does not contain any evidence to suggest that the potential was great. See Kissinger, 922 S.W.2d at 488. Therefore, the trial court erroneously applied factor (16).

With respect to mitigation, the defendant does not specifically detail any mitigating factors that the trial court should have considered. Although the defendant mentioned briefly at the sentencing hearing that he had no prior criminal record, he argued it relative to consecutive sentencing. In any event, we believe that the defendant's lack of a prior criminal record should be considered relative to the length of the sentences imposed. See T.C.A. § 40-35-114(13); State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995). Also, the defendant's cooperation with the police should be considered. See T.C.A. § 40-35-113(10). The defendant gave two statements to the police and signed two permission to search forms. Sheriff Mercer stated that the defendant went with them each time they searched the defendant's

42

home and helped them locate items. However, although these factors should be considered, we do not believe that they are entitled to significant weight in the context of this case.

Although the presumption of correctness that accompanies the trial court's determinations has fallen because the trial court did not properly consider all of the relevant sentencing principles, see Ashby, 823 S.W.2d at 169, we affirm the defendant's sentences for each conviction of aggravated rape and aggravated sexual battery. Even though the trial court inappropriately applied factors (2) and (16) to all convictions and factor (7) to the aggravated sexual battery convictions and it failed to consider the applicable mitigating factors, the proof supports a twenty-year sentence for each rape of a child conviction and a ten-year sentence for each aggravated sexual battery conviction. Contrary to the defendant's argument, he is not entitled to a reduction in sentence merely because we conclude on appeal that the trial court incorrectly applied sentencing and mitigating factors. Hayes, 899 S.W.2d at 186-87.

In Hayes, our court stated that:

> even if we determine that fewer factors should apply than used by the trial court, this does not mean that the length of the sentence is automatically reduced. That is, if the same degree of culpability and negative circumstances relate to the remaining applicable factors, the original enhancement may still be appropriate.

Id. Such is the case here. The defendant was charged with the care and control of the victim, yet he abused that position of trust even though he realized that his conduct could affect the victim for the rest of her life. Not only did he abuse the victim's trust but he also refused to accept responsibility for his own conduct. Instead, he placed the blame on his six-year-old daughter, claiming that she was the one who instigated the sexual occurrences and asserting that he received no sexual pleasure from them. He raised the victim in such an abnormal environment that the victim viewed having sex with her father as not only acceptable but also enjoyable. We believe that the

43

defendant's culpability in relation to the remaining applicable factors justifies the mid-range sentences imposed by the trial court.

## B.  CONSECUTIVE SENTENCING

Next, the defendant contends that the trial court erroneously imposed consecutive sentences.  He argues that the trial court failed to state its grounds for consecutive sentencing.  Although we agree that the trial court should have been more explicit with its findings, the record indicates that the trial court relied upon T.C.A. § 40-35-115(b)(5) in imposing consecutive sentences.  At the sentencing hearing, the state relied upon (b)(5), and defense counsel limited its argument to the factor.  Pursuant to T.C.A. § 40-35-115(b)(5), the court may order the defendant's sentences to run consecutively if the court finds by a preponderance of the evidence that:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims . . . .

In this case, the defendant was convicted of a total of five statutory offenses involving sexual abuse of a minor.  As discussed earlier, aggravating circumstances were present in this case.  Although the defendant's conduct occurred over a short period of time, the nature and scope of the defendant's sexual acts were extensive.  We believe that the record fully supports the trial court's decision to impose consecutive sentences.

In consideration of the foregoing and the record as a whole, the defendant's convictions and sentences for rape of a child and aggravated sexual battery are affirmed.

44

                                          _____

                                          Joseph M. Tipton, Judge

CONCUR:

_____

John H. Peay, Judge

_____

David H. Welles, Judge