IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

## STATE OF TENNESSEE v. ROBERT A. NORRIS and LIDA MEADOR

**Direct Appeal from the Criminal Court for Cumberland County**
**No. 4860A & B   Leon Burns, Jr., Judge**

───────────

**No. E1999-00485-CCA-R3-CD - Decided - May 31, 2000**

───────────

This direct appeal presents a certified question of law pursuant to Rule 37(b)(2)(i), Tennessee Rules of Criminal Procedure.  The defendants pleaded guilty to manufacture of a controlled substance, subject to reservation of a certified question.  In their certified question, the defendants contend that law enforcement officers conducted an unreasonable search and seizure when the officers made thermal image scans of their home, that the search warrant did not allege sufficient facts to establish probable cause, and that the information upon which the search warrant was issued was stale.  One defendant received judicial diversion and is not properly before this court on a Rule 3 appeal, and we decline to grant her a Rule 10 extraordinary appeal.  We conclude that thermal imaging is not an unconstitutional search, and the affidavit information was not stale.  However, because the search warrant affidavit failed to establish probable cause for the search, we reverse the trial court's denial of Norris's motion to suppress.  Norris's conviction is vacated and his charge is dismissed.  Meador's appeal is dismissed.

**Tenn .R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed, Conviction Vacated, and Charge Dismissed for appellant Norris.  Appellant Meador's appeal is dismissed.**

WITT,  J., delivered the opinion of the court, in which WOODALL, J., joined, and RILEY, J., filed a separate opinion concurring in part and dissenting in part..

Joe L. Finley, Assistant Public Defender, for the appellant, Robert A. Norris.
Randall A. York, Crossville, Tennessee, for the appellant, Lida Meador.

Paul G. Summers, Attorney General & Reporter, Ellen H. Pollack, Assistant Attorney General, William Edward Gibson, District Attorney General, David Alan Patterson and Anthony J. Craighead, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendants, Robert A. Norris and Lida Meador, appeal a certified question of law pursuant to Rule 37(b)(2)(i), Tennessee Rules of Criminal Procedure. In the Cumberland County Criminal Court, the defendants pleaded guilty to manufacture of a controlled substance, a class E felony, subject to reservation of a certified question. In their certified question, the defendants contend that law enforcement officers infringed on their rights to be free of unreasonable searches and seizures pursuant to the Fourth Amendment of the United States Constitution and article 1, section 7 of the Tennessee Constitution, that the search warrant did not allege sufficient facts to establish probable cause, and that the information upon which the search warrant was issued was stale. After hearing oral argument and reviewing the record and the briefs of the parties, we reverse the trial court's denial of Norris's motion to suppress, vacate Norris's conviction and dismiss his charge. We dismiss Meador's appeal.

The facts in the case at bar are not in dispute. On May 5, 1997, the Cumberland County Sheriff's Department searched the defendant's residence pursuant to a search warrant issued that same day. As the result of the search, the defendants were indicted for the manufacture of a controlled substance, namely marijuana, possession with intent to sell or deliver more than one-half ounce of marijuana, and possession of drug paraphernalia. See Tenn. Code Ann. § 39-17-417 (1997) (manufacture and possession with intent to sell or deliver); Tenn. Code Ann. § 39-17-425 (1997) (drug paraphernalia). After the trial court denied their motion to suppress, the defendants pleaded guilty to the offense of manufacture of a controlled substance and reserved a certified question with respect to the legality of the search. Defendant Norris was sentenced to two years in the Tennessee Department of Correction, to be served on probation for two years. He was also fined $2000. Defendant Meador received judicial diversion and agreed to pay a $250 fine.

Initially, we note that Norris has properly preserved his question of law under Rule of Criminal Procedure 37(b)(2). In State v. Preston, 759 S.W.2d 647 (Tenn. 1988), our supreme court stated that

> the final order or judgment from which the time begins to run to pursue a T.R.A.P. 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved.

Id. at 650.

In the case at bar, the trial court's order reserving the right to appeal contains a statement of the certified question which clearly identifies the scope and limits of the issue, and the order, signed by the parties, states that this issue is dispositive. Norris's judgment form contains a note that his plea of guilty was entered with the reservation that the trial court's denial of the motion to suppress is being appealed and may void the conviction. Accordingly, Norris's certified question is properly before us.

With respect to Meador, jurisdiction is not so easily determined. She entered a best interest guilty plea and was judicially diverted pursuant to Code section 40-35-313. According to

-2-

this section, the court, with the consent of the defendant, defers further proceedings and places the defendant on probation without entering a judgment of conviction. Tenn. Code Ann. § 40-35-313(a)(1)(A) (1997). A final disposition of the case does not occur until either the defendant violates a condition of the probation or the probation period ends. See id. at (a)(2). If the defendant is successful in completing probation, the charges are dismissed, "without court adjudication of guilt." Id.

While in the posture of having pleaded guilty and having been granted judicial diversion, Meador endeavors to appeal a certified question of law under Tennessee Rule of Criminal Procedure 37(b)(2). The 37(b) provisions allow the reservation of a certified question of law that is dispositive of the case, "[u]pon a plea of guilty or nolo contendere." Tenn. R. Crim. P. 37(b)(2). However, the appeal of the reserved, certified question is controlled by Rules 37(a), (b), 32(e), and Tennessee Rule of Appellate Procedure 3(b), (c).

The interplay among these rule provisions is somewhat intricate. Rule 37(b) says, "*An appeal* lies from any order or judgment in a criminal proceeding where the law provides for such an appeal, and from any judgment of conviction . . . [u]pon a plea of guilty or nolo contendere," when the requirements for a reservation of a certified question are met or when other bases for a post-guilty plea are present, which bases are not applicable in the present case. Tenn. R. Crim. P. 37(b) (emphasis added). The rule defines "an appeal" as used in Rule 37 as "[d]irect appellate review *available as a matter of right*." Tenn. R. Crim. P. 37(a) (emphasis added). Thus, in order for a defendant to claim the benefits of a certified question appeal under Rule 37(b), the order or judgment from which the appeal is sought must be appealable "as a matter of right."

The rules establish two types of cases which entail appeals as a matter of right. First, Tennessee Rule of Appellate Procedure 3(b) provides that, in a "criminal action[,] an appeal as of right by a defendant lies *from any judgment of conviction* entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) on a plea of not guilty; and (2) on a plea of guilty or nolo contendere, if the defendant entered into a plea agreement but explicitly reserved with the consent of the state and the trial court the right to appeal a certified question of law dispositive of the action" or the defendant desires to appeal a sentence or certain other issues to which he is not bound by his guilty plea, the latter being circumstances not applicable in the present case. Tenn. R. App. P. 3(b) (emphasis added). Second, Rule of Criminal Procedure 37(b) mentions additional provisions for appeals as a matter of right which do not emanate from judgments of conviction - appeals which emanate from "any order or judgment . . . where the law provides" for an appeal as a matter of right. Tenn. R. Crim. P. 37(b). One must switch back to Rule of Appellate Procedure 3(b) to ascertain when the law provides for such additional appeals: "The defendant may also appeal as of right from an order denying or revoking probation, and from a judgment in a criminal contempt, habeas corpus, extradition, or post-conviction proceeding." Tenn. R. App. P. 3(b). Therefore, an appeal of a dispositive certified question of law may be made as a matter of right in two situations: (1) upon the entry of a judgment of conviction, which by definition sets forth "the plea, the verdict or findings, and the adjudication and sentence," Tenn. R. Crim. P. 32(e), or (2) upon the entry of one of the orders specified above. We review in turn these possibilities and their possible application to the present case.

(1) <u>An appeal founded upon a judgment of conviction</u>.  As pointed out above, the guilty plea which results in an order of judicial diversion is not consummated into a judgment of conviction, unless the defendant breaches the conditions of his diversion/probation.  Tenn. Code Ann. § 40-35-313(a)(1)(A), (2) (1997).  Consequently, the rule provisions for a rightful appeal based upon a judgment of conviction do not authorize an appeal of a certified question in the present case.

(2) <u>An appeal based upon an order denying or revoking probation or a final judgment in a criminal contempt, habeas corpus, extradition, or post-conviction proceeding</u>.  Among the alternative bases for an appeal as a matter of right, one basis - an order denying probation - makes a connection with judicial diversion.  "Judicial diversion" is merely "an appellation supplied by the courts, probably to distinguish it from section 40-15-105 pretrial diversion, and the phrase is not used in the governing statute, section 40-35-313."  <u>State v. Stephen J. Udzinski and Donna Stokes</u>, No. 01C01-9810-CC-00431, slip op. at 9 (Tenn. Crim. App., Nashville, Feb. 5, 1998) (minority opinion).  In actuality, the statute is a "probation" statute.  <u>Id</u>.  It is captioned as such and is inserted in the Code "immediately after the provisions dealing with other forms of probation."  <u>State v. Talmadge G. Wilbanks</u>, No. 02C01-9601-CR-00003, slip op. at 5-6 (Tenn. Crim. App., Jackson, Nov. 19, 1996), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. 1997).  Section 40-35-313 prescribes probation during the deferral period.

This nexus of judicial diversion, or "probation," to the alternative bases for a rightful appeal avails the Defendant Meador nothing, however, for at least two reasons.  First, she is not attempting to appeal the diversion decision itself; rather, she seeks review of the pre-diversion issue of the trial court's denial of a motion to suppress evidence.  For the reasons given above, the appellate review as of right of this issue clearly requires a judgment of conviction.  <u>See</u> <u>Udzinski</u>, slip op. at 11 (minority opinion); <u>see also</u> <u>State v. Glenna Kidd</u>, No. 01C01-9808-CR-00344, slip op. at 2-3 (Tenn. Crim. App., Nashville, May 13, 1999).  Second, the alternative appeal basis of an order "denying probation" cannot be used for the simple reason that probation was not denied.  It was granted, and only the state has a basis for a rightful appeal in such a situation.  <u>See</u> Tenn. R. App. P. 3(c).

The conclusion is that Meador, having not been denied probation and not seeking to appeal the diversion order, and having received no conviction judgment, has no rightful appeal and, consequently, no basis for appealing a certified question of law.  In passing, we find no disharmony nor unfairness in the rules which establish these requirements.  A trial court may not impose judicial diversion except with the defendant's consent.  Tenn. Code Ann. § 40-35-313(a)(1)(A) (1997).  As a practical matter, a trial court rarely if ever grants judicial diversion until a defendant has literally begged for it.  At any rate, a defendant has the options (1) to eschew judicial diversion if he or she wishes to seek a review of a given issue through the appropriate method of appeal, (2) when seeking judicial diversion after a guilty plea, to reserve a certified question, upon submitting a plea, to be presented on appeal pursuant to Rule 37(b) after judicial diversion is denied and a judgment is entered, or if diversion is granted, to be presented on appeal if and when the diversion probation is revoked and judgment is entered, (3) if judicial diversion is granted after a trial, to raise an issue on appeal in the event of a revocation of the diversion probation, or (4) in the appropriate circumstances, to seek a discretionary, interlocutory appeal under Tennessee Rules of Appellate Procedure 9 or 10.

-4-

Although the choice to accept judicial diversion at least postpones and perhaps jeopardizes the defendant's opportunity to raise a legal issue, the *quid pro quo*, as compared to the defendant who pleads guilty and receives a conviction and a probated sentence, is that the defendant who accepted diversion has a self-determined chance to emerge from the process without a conviction on his or her record.

That said, this court may treat an improperly filed Rule 3 appeal as a Rule 10 extraordinary appeal. See State v. Leath, 977 S.W.2d 132, 135 (Tenn. Crim. App. 1998); State v. James Doe, No. 01C01-9102-CR-00046, slip op. at 5-6 (Tenn. Crim. App., Nashville, June 29, 1992). Tennessee Rule of Appellate Procedure 10(a) provides that an extraordinary appeal may be sought "if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review or . . . if necessary for complete determination of the action on appeal . . . ." Tenn. R. App. P. 10(a).

We conclude, however, that Meador does not present a compelling case for the granting of a Rule 10 appeal. Typically, the Rule 10 requirements for a discretionary appeal are not met when a trial court overrules a defendant's motion to suppress evidence. We see no reason why this typical result should not prevail in this case. Accordingly, Meador's appeal must be dismissed.

We now move to consider Norris's challenge to the denial of his motion to suppress the evidence obtained by means of a search warrant executed on May 5, 1997. In his certified question, he presents three grounds in support of his contention that the search warrant was defective. First, the thermal imaging scans performed on his house violated his constitutional rights, and including the results of the scans in the affidavit tainted the probable cause determination. Second, the information contained in the warrant's affidavit did not establish probable cause. Third, the information contained in the search warrant was stale.

## I. Thermal Imaging

Norris contends that the search warrant was defective because the probable cause determination was based on thermal imaging scans performed on his house. The defendant complains that when the law enforcement officers made thermal imaging scans of his home, the officers infringed their rights to be free of unreasonable searches and seizures pursuant to the Fourth Amendment of the United States Constitution and article 1, section 7 of the Tennessee Constitution.

The Constitution of the State of Tennessee guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." Tenn. Const. art. I, § 7. This same guarantee is embodied in the Fourth Amendment of the United States Constitution. The touchstone of unreasonable search and seizure analysis is "whether a person has a 'constitutionally protected reasonable expectation of privacy.'" California v. Ciraolo, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811 (1986); see Katz v. United States, 389 U.S. 347, 360, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring).

-5-

Through Katz and its progeny, the United States Supreme Court has pronounced a two-part inquiry in determining an individual's constitutionally protected reasonable expectation of privacy. "[F]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" Ciraolo, 476 U.S. at 211, 106 S. Ct. at 1811; State v. Bowling, 867 S.W.2d 338, 341 (Tenn. Crim. App. 1993). Such analysis has been applied in this state. See, e.g., State v. Roode, 643 S.W.2d 651, 652-3 (Tenn. 1982).

In determining whether defendant Norris manifested a subjective expectation of privacy, we are aware that neither the Fourth Amendment nor article 1, section 7 of the Tennessee Constitution protects what a citizen "knowingly exposes to the public." See Katz, 389 U.S. at 351, 88 S. Ct. at 511; Bowling, 867 S.W.2d at 341. "That which a citizen knowingly exposes to the public is that in which he or she has not manifested [a] subjective expectation of privacy." Bowling, 867 S.W.2d at 341.

In order to determine whether the defendant had a reasonable expectation of privacy, we must first determine the nature of the activity that was detected by the thermal imaging scans made of the defendant's home.[1] A thermal imaging device, or a thermal imager, is a video camera-like device which provides an image based on the temperature of objects viewed. Just as a camera shows images based on light, a thermal imager shows images based on temperature.

A thermal imager displays images of objects or surfaces at a higher temperature as whiter than other, cooler objects. The imager used in the case at bar could indicate differences in temperature as little as one-quarter degree Celsius. However, it could not provide information on the actual temperature of the objects viewed. Other, more sophisticated thermal imagers can provide measurements indicating the actual temperature of the objects scanned.

A thermal imager relies on the heat radiated from objects and surfaces in order to produce its images. Every object radiates heat as infra-red energy. The amount of radiation given off by an object is dependent upon the object's emissivity[2] and temperature. Unlike a light-based camera, a thermal imager cannot see through glass. It can only see the temperature of the glass. Very few common items are transparent to heat radiation. For most materials, a thermal imager is not capable of "seeing" through or scanning beyond the first substantial object it encounters.

To say that the thermal imager can detect the heat loss of the house is not entirely accurate. The thermal imager detects the differential temperature of house surfaces. One factor that

---

[1] This discussion regarding thermal imaging is based on evidence presented at the suppression hearing and in United States v. Kyllo, 190 F.3d 1041 (9th Cir. 1999), which contains a discussion of the general theory and uses of thermal imaging.

[2] Emissivity is the relative ability of a surface to radiate energy as compared with that of an ideally black surface under the same conditions. Webster's New Collegiate Dictionary (1996).

may make an outside surface warmer than other, similar surfaces is poor insulation, which is typically a cause of heat loss and poor energy efficiency. However, the higher surface temperature may also be due to a heat source located behind the wall.

In the case at bar, the thermal imaging equipment operator testified that the equipment was not capable of detecting the contents of or the activities in the defendant's basement. The imager could only indicate that the outside basement wall was at a higher temperature than other walls and surfaces. The higher temperature could have been due to someone living in the basement. It also could have been due to a furnace or other whole-house heater, high-intensity growing lights, or another heat source in the basement. What was exposed to the public, and made accessible through the use of thermal imagery, was only the information of the differential temperatures of the outside surfaces of the defendant's home. Based on the detection of the higher temperature of the exterior basement walls, the police asserted in a search warrant affidavit that the defendant was growing marijuana plants in the basement.

We move directly to the second Katz inquiry, whether any expectation of privacy maintained by the defendant in the surface temperature of his home was reasonable. Katz, 106 S. Ct. at 1811 (Katz second inquiry). "In pursuing this inquiry, we must keep in mind that '[t]he test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.' " Id. at 212, 106 S. Ct. at 1812 (quoting Oliver v. United States, 466 U.S. 170, 182-83, 104 S. Ct. 1735, 1743 (1984)).

We are not persuaded that the defendant's expectation of privacy is reasonable. Thermal imaging is a non-invasive, non-intrusive method of detecting elevated outside surface temperatures of houses and other structures. It cannot determine what type of activity inside the home caused the outside surface temperature to be elevated, although the outside surface temperature is due, in part, to activities conducted inside the home. Thermal imaging devices cannot see inside the home or through walls. Because thermal imaging cannot detect any details of the defendant's private life, we conclude that his expectation of privacy in the differential surface temperature of his home is unreasonable. Accordingly, the use of a thermal imaging device did not amount to a search, and therefore, no Fourth Amendment protection attaches.

While the factual situation makes this a case of first impression in Tennessee, support exists for our conclusion in the decisions of other jurisdictions. In United States v. Kyllo, 190 F.3d 1041 (9th Cir. 1999), petition for cert. filed, (Mar. 7, 2000), the United States Court of Appeals reached the same conclusion under similar facts as the case at bar. Id. at 1045-47. The Kyllo court determined that thermal imaging, "while giving information unavailable to the naked eye, did not expose any intimate details of [the defendant's] life." Id. at 1047. The Kyllo court could not "conclude that this surveillance was 'so revealing of intimate details as to raise constitutional concerns.'" Id. (quoting Dow Chem. Co. v. United States, 476 U.S. 227, 238, 106 S. Ct. 1819, 1827 (1986)); see also, e.g., United States v. Mooring, 137 F.3d 595 (8th Cir. 1998); United States v. Ishmael, 48 F.3d 850 (5th Cir. 1995); United States v. Myers, 46 F.3d 668 (7th Cir.1995); United States v. Ford, 34 F.3d 992 (11th Cir. 1994). But see Commonwealth v. Gindlesperger, 743 A.2d

898 (Pa. 1999); State v. Young, 123 Wash. 2d 173, 867 P.2d 593 (Wash. 1994) (thermal imaging of citizen's home violated state constitution's protection of defendant's private affairs and protection against warrantless invasion of home).

## II. Probable Cause

Norris contends that the search warrant was defective because the information contained in the warrant's affidavit was not sufficient to establish probable cause. At the suppression hearing, the state conceded that in the absence of the thermal imaging results, the allegations of the affidavit were not sufficient to establish probable cause.

In pertinent part a deputy in the Cumberland County Sheriff's Department, stated in his affidavit in support of the search warrant that

> he has been a narcotics K-9 officer for 2-1/2 years, and a certified police officer for 4-1/2 years and has been trained in the detection of "marijuana grow systems" and in the use of thermal imagery. Affiant has been trained to detect marijuana growing operations and has personal knowledge that the said Robert A. Norris and Lida A. Meador have grown marijuana indoors prior to this date as evidenced by the removal of a grow operation in September of 1996. Affiant states that the house/residence seems to have a high level of abnormal security which is typical of homes with growing operations, to-wit: 1) the windows are painted black and 2) the house has a lock and hasp. The blacked out windows prevent view of the inside of the residence and the lock and hasp protect it from entry. Another characteristic which is consistent with a marijuana growing residence is the fact that the levels of electricity used vary throughout the year. The residence is that of persons whom affiant knows to have had a grow operation prior to this date. Said persons do have an arrest record of usage and sale of a controlled substance. Affiant further states that this affidavit is based upon the use of a thermal imaging device. Said thermal image device does a non-contact, heat sensing, of surfaces. It is passive and non-intrusive and does not see into or through structures. Thermal technology has been used since the 1950s and is available to the public and is commonly used. The thermal operator used in this instance is David Caruthers of the Tennessee National Guard and he is certified in the use of thermal imaging and has been involved in other Criminal Court cases as an operator. The first imaging session at this residence/home was on February 12, 1997, at approximately 12:40 AM, and again on the same date at approximately 2:55 AM. He said the basement was much hotter than the living areas of the residence. On February 20, 1997 at approximately 1:00 AM, another thermal imaging was performed and a video made of the subject residence, and a "good heat signature" was present. Another dwelling in the area, of similar structure, was also thermal imaged at approximately the same time, which did not show any heat at all in the basement area. Neither dwelling is known to have people living in the basement area. On March 13, 1997 at approximately 2:55 AM, another session was conducted of the residence of Robert A. Norris and Lida A.

-8-

Meador, and the thermal operator received the highest heat signature yet. On March 26, 1997, another thermal session was done and a better signature was shown. This shows that the amount of heat has been progressive since the thermal imager was first used. The heat imaging results are consistent with the affiant's training for detection and indicate a marijuana grow system within the basement of the described dwelling.

At the suppression hearing, the deputy-affiant admitted that he was not a certified operator for thermal imaging and that he had no formal training in thermal imaging. He testified that he never worked with thermal imaging prior to the case at bar. He admitted that his statement in the affidavit that he "has been trained . . . in the use of thermal imagery" was "inaccurate" because his only training in thermal imagery was what he learned from the operator of the thermal imaging equipment in the case at bar.

Also, the deputy testified that he knew that the basement windows were painted black when the residence was searched in September of the previous year. He stated that he was not certain if the lock and hasp were present during the previous search.

He testified that he did not investigate whether anyone was living in the basement of the defendant's home before he made the allegation, "Neither dwelling is known to have people living in the basement area."

The deputy testified that he subpoenaed the defendant's electrical records. He could not remember why he did not disclose the details of defendant's electrical usage or otherwise support his allegation that "the levels of electricity used var[ied] throughout the year." The deputy stated that the defendant's electrical usage for January and April of 1997 was less than for the same months in 1996. Also, he stated that the defendant's electrical usage for each of the months of February and March of 1997 was greater than that of January 1997 and that their usage from February through April of 1997 decreased each month. He did not know what the average outside temperatures were during that period of time.

The operator of the thermal imaging device, David Caruthers of the Tennessee Army National Guard Drug Division, testified at the suppression hearing. He did not know whether anyone was living in the defendant's basement or if there was a furnace in the basement. He testified that either condition would produce thermal imaging results similar to those he obtained from the defendants' house.

Caruthers testified that he could not say whether any one of the five thermal imaging scans made of the defendant's home showed a higher or lower temperature relative to the other scans. He said that the terms he used, such as "good heat signature" and "better signature," indicate the quality of the scan and are not indicative of the temperature of the basement relative to other scans made of the same basement at other times. Caruthers admitted that the heat imaging results were not necessarily indicative of a growing operation.

The issue presented by the defendants is whether the affidavit upon which the search warrant was issued sufficiently states probable cause. In reviewing the issue, we must uphold the trial court's denial of the defendants' motion to suppress unless the evidence preponderates against the lower court's findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In Odom, our supreme court clarified the standard to be used by appellate courts when reviewing the trial court's findings of fact and conclusions of law:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23. The application of the law to the facts found by the trial court, however, is a question of law which this court reviews *de novo*. State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997); Odom, 928 S.W.2d at 23.

"[T]he sufficiency of a search warrant affidavit is to be determined from the allegations contained in the affidavit alone." State v. Henning, 975 S.W.2d 290, 297 (Tenn. 1998). Probable cause for the issuance of a search warrant exists when facts and circumstances demonstrated by an underlying affidavit are sufficient in themselves to warrant a person of reasonable caution to believe that certain items are the fruits of illegal activity and are to be found at a certain place. United States v. Acklen, 690 F.2d 70 (6th Cir. 1982); see, e.g., Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983); Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584 (1969). In reviewing a search warrant affidavit for probable cause, we must read the language "in a commonsense and practical manner," State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982), and the affiant's words should be given their natural meaning and interpretation. State v. Smith, 477 S.W.2d 6, 8 (Tenn. 1972). The reviewing standard is whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing. Spinelli, 393 U.S. at 418, 89 S. Ct. at 590; State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989). On review, determinations of probable cause are factually specific and must be dealt with on a case-by-case basis. Fowler v. United States, 229 F.2d 215 (6th Cir. 1956). A magistrate's probable cause determination is accorded "great deference" by a reviewing court. Jacumin, 778 S.W.2d at 431-32.

The Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article 1, section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued

except upon probable cause. Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983); State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998); see also Tenn. Code Ann. § 40-6-103 (1997).[3]

We conclude that the search warrant affidavit sets forth only conclusory statements that do not explain why the observed activity indicates an illegal act. As noted by the Supreme Court of Utah, "[p]olice officers by virtue of their experience and training can sometimes recognize illegal activity where ordinary citizens would not. Some recognition should appropriately be given to that experience and training where there are objective facts to justify the ultimate conclusion." State v. Dorsey, 731 P.2d 1085, 1088 (Utah 1986) (citations omitted) (emphasis added). Here, there are no facts that support the affiant's conclusions. For example, the affiant states that "[a]nother characteristic which is consistent with a marijuana growing residence is the fact that the levels of electricity used vary throughout the year;" yet, the affidavit does not state specific levels of use, nor does it state why such varying use is significant. The affiant has provided no basis for his opinion that a particular pattern of electricity usage equates to growing marijuana, and thus the statement regarding electricity use has no probative value whatsoever.

---

[3]In making his probable cause determination, the magistrate must rely on accurate information. False or misleading statements in the affidavit may invalidate a search warrant. State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978). In Little, our supreme court held that

> there are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made.

Id. at 407. In addition, the court held, "Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." Id. In order to be "essential to the establishment of probable cause," the false statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause. State v. Tidmore, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980). The evidence presented at the suppression hearing indicates that the affidavit contained reckless and misleading statements concerning the deputy's training in thermal imaging surveillance, the timely significance of the blacked-out windows, the significance of the electrical usage, the inculpative nature of follow-up thermal imaging scans, and whether anyone occupied the basement level of Norris's house.

Had the trial court reviewed whether the affidavit established probable cause without the tainted allegations, we would be inclined to do likewise. See Tidmore, 604 S.W.2d at 882. However, appellate review of certified questions of law is "limited to those [issues] passed upon by the trial judge." State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988). For this reason, we consider the affidavit in its totality, including allegations which the record shows to be misleading.

The same reasoning applies to the evidence procured by the thermal imaging device. The affiant never states why the detection of heat is relevant in detecting a marijuana growing operation. The affidavit does not state why one would ordinarily not expect to find heat in the basement of a house. Nor does the affidavit say why increased levels of heat are consistent with a growing operation. Even reading the affidavit in a common-sense fashion, one is unable to find any other information in the affidavit which would show why the thermal imaging information is probative of a marijuana growing operation.

In short, the affidavit provided conclusory statements without stating facts as to why the conclusions were valid. For instance, painted windows prevent someone from seeing inside a home but so do blinds and curtains. A lock and hasp prevent entry but so does a dead bolt lock. The affidavit does not explain why painted windows and a lock and hasp are typical of homes with growing marijuana operations instead of homes whose residents prefer more privacy and security.

The net result is that the affiant requested a warrant because Defendant Norris has a prior criminal background. This is not a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing. The warrant fails for lack of probable cause, and thus the items seized during the resulting search should have been suppressed.

### III. Staleness

The defendant contends that the search warrant was defective because the information contained in the affidavit supporting the search warrant was stale. The defendant argues that the 40-day delay in making the affidavit after the last thermal imaging scan renders the thermal imaging information stale. In light of our conclusion that the search warrant is invalid, this issue is moot. However, because of the possibility of further review, we will address the defendants' final issue. See Jacobs v. State, 224 Tenn. 106, 107, 450 S.W.2d 581, 582 (Tenn. 1970).

In order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that the contraband will be found in the place to be searched pursuant to the warrant. State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981). The affidavit must allege that the contraband sought to be seized or the illegal activity in question exists at the moment the search warrant is to be issued. State v. Curtis, 964 S.W.2d 604, 616 (Tenn. Crim. App. 1997) (citing Sgro v. United States, 287 U.S. 206, 210-12, 53 S. Ct. 138, 142 (1932)). To this end, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. Longstreet, 619 S.W.2d at 99; see also State v. Vann, 976 S.W.2d 93, 105 (Tenn. 1998).

Staleness must be determined on a case-by-case basis. State v. Meeks, 876 S.W.2d 121 (Tenn. Crim. App.1993). "When the illegal activity described is ongoing, courts have generally held that the affidavit does not become stale with the passage of time." State v. Thomas, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991). The issuing magistrate must consider "whether the criminal activity under investigation was an isolated event or of a protracted and continuous nature, the nature

-12-

of the property sought, and the opportunity those involved would have had to dispose of incriminating evidence." Meeks, 876 S.W.2d at 124.

In the case at bar, the last of the series of thermal imaging scans was performed on March 26, 1997, and the affidavit was sworn on May 5, 1997. Thus, 40 days elapsed between the last thermal imaging scan and the execution of the affidavit and search warrant. Under the circumstances here, this almost six-week delay does not render the information stale. The affidavit alleged that the defendant was growing marijuana, an illegal act which occurs over a several month period.

At the very least, the affidavit alleges that the defendant was growing one crop of marijuana. For a single crop, the illegal activity of growing marijuana is ongoing and continuous for the period required for the plants' development. Therefore, the illegal activity of growing marijuana is not an isolated event but requires a protracted period of time to complete. See Meeks, 876 S.W.2d at 124. Accordingly, the date of the search warrant was not so far removed from the various thermal imaging dates that the fruits of the growing operation would not be still be found at the defendant's residence.

The trial court's denial of Norris's motion to suppress is reversed. Norris's conviction is vacated, and his charge is dismissed. Meador's appeal is dismissed.