IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2019

**STATE OF TENNESSEE v. CARRINGTON OWENS**

**Appeal from the Circuit Court for Montgomery County**
**No. CC16-CR-497    William R. Goodman III, Judge**

_____

**No. M2018-01830-CCA-R3-CD**

_____

The Defendant, Carrington Owens, was convicted by a Montgomery County Circuit Court jury of four counts of rape of a child, a Class A felony; twenty-three counts of especially aggravated sexual exploitation of a minor, a Class B felony; and twelve counts of aggravated sexual battery of a child less than thirteen years of age, a Class B felony. *See* T.C.A. §§ 39-13-522 (Supp. 2007, 2010, Supp. 2011) (rape of a child), 39-17-1005 (2006) (subsequently amended) (especially aggravated sexual exploitation of a minor), 39-13-504 (2018) (aggravated sexual battery). He is serving an effective thirty-seven-year sentence for his convictions. On appeal, he contends that the trial court erred in denying his motion to suppress evidence from a search of his home and that he was denied the right to confront his accuser face-to-face. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Gregory D. Smith (on appeal) and Travis Meeks (at trial), Clarksville, Tennessee, for the Appellant, Carrington Owens.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to sexual abuse of two victims, the daughter of a woman with whom the Defendant had a relationship and the Defendant's daughter with the woman. At the trial, the State introduced photographic evidence of the offenses,

which had been recovered from the Defendant's computer following the execution of a search warrant at the Defendant's apartment, as well as the testimony the older victim, who was not the Defendant's daughter. On appeal, the Defendant does not challenge the sufficiency of the evidence to support his convictions. Thus, our review of the evidence is limited to that which is relevant to the Defendant's two appellate issues.

# I

## Denial of Motion to Suppress

The Defendant filed a pretrial motion to suppress the evidence obtained from the search of his apartment on the basis that the affidavit which was used to obtain the warrant contained stale information. The parties filed extensive memoranda relative to the issue and submitted the matter for the trial court's consideration without an evidentiary hearing.

In a May 13, 2014 affidavit, Montgomery County Sherriff's Investigator Bishop Delaney sought a search warrant for an apartment at a specified address and a specified vehicle. The items to be seized included computer hardware and related devices, which were believed to contain evidence of violations of the sexual exploitation of a minor statute. The affiant stated that, on September 21, 2013, he identified an Internet Protocol (IP) address as a potential download source of at least twenty-nine files of investigative interest relative to child pornography. He stated that a computer using the same IP address recently had been detected by one or more investigators searching for child pornography. The affiant stated that, on October 3, 2013, he downloaded a file from the IP address which contained a five-minute, fifty-nine second video of a prepubescent female child engaged in sexual activity with an adult male. The affiant stated that the internet provider's records were subpoenaed and revealed that the Defendant was the subscriber of the services at the stated IP address and that the Defendant's physical address was at a specified apartment in Clarksville. The affiant did not state the date the subpoena was issued and the date the records were received from the internet provider. The affiant requested that a search warrant be issued for the apartment at the specified address.

The Defendant argued in a memorandum filed with his motion to suppress that the information regarding "the nexus between the criminal activity and the place to be searched" was stale because of the passage of seven months between the officer's receipt of the relevant information and the issuance of the search warrant. Significantly, the Defendant did not argue that the information in the affidavit related to alleged criminal activity was stale. He argued, "It was not a reasonable presumption of the issuing magistrate that the defendant was still residing at the same apartment seven months after the fact." He argued, further, "The State should have been required to corroborate that

the same criminal defendant continued to reside at the same apartment seven months after the fact before they were allowed to obtain a search warrant for that particular apartment." The Defendant also argued that two unreported cases, *State v. Domnick Doria*, No. M2014-01318-CCA-R3-CD, 2016 WL 1694120 (Tenn. Crim. App. Apr. 26, 2016), *perm. app. denied* (Tenn. Aug. 17. 2016), *overruled on other grounds by State v. Miller*, 575 S.W.3d 807, 812-13 (Tenn. 2019), and *State v. Robert D. Ewing and Anthony T. Ewing*, No. E2013-01587-CCA-R3-CD, 2014 WL 2609463 (Tenn. Crim. App. June 11, 2014), established "the outer limits of how long the state can sit on information before the Appellate Courts would allow them to apply for a search warrant." The Defendant argued that *Domnick Doria* permitted a search after three months, that *Robert D. Ewing* permitted a search after four months, and that "[y]ou would have to add those two cases together to get the lapse of time between the observation of relevant information and the application of the search warrant in the case at bar."

The State filed a response to the motion, which alleged additional facts related to the investigation and to the timing of the affidavit requesting a search warrant. These allegations of fact included the dates that Investigator Delaney had been on leave during the delay and the date shortly before the request for a search warrant when Investigator Delaney spoke with the manager of the Defendant's apartment to confirm that the Defendant was still a resident. Notably, these allegations had not been included in the affidavit for the search warrant.

The Defendant filed additional memoranda, in which he argued that a judicial review of probable cause was limited to the information contained in the affidavit upon which the search warrant was issued and that the affidavit in this case contained no allegations that the Defendant's address was verified after October 3, 2013. The Defendant also reiterated his previous arguments.

The State filed an additional memorandum, in which it argued that the information asserted in the affidavit had not become stale and that the issuing magistrate reasonably concluded from the information contained in the affidavit that the Defendant still lived at the apartment address listed.

In its order denying the motion to suppress, the trial court found that the search warrant had been issued and executed on May 13, 2014, approximately seven months after the October 3, 2013 date that the specified IP address had been associated with a download of child pornography. The court found that the Defendant's residing in an apartment "subject to a lease of less than one year is not sufficient to create a different standard for individuals who reside in rented apartments." The court rejected, as well, the Defendant's argument that two Court of Criminal Appeals cases holding that delays of three months and four months between the discovery of the information and the

issuance of the warrants established the outer limits of an acceptable delay between the discovery of information related to criminal activity and the issuance of a search warrant.

On appeal, the Defendant argues that the pivotal issue is, "[W]hen does child pornography information become stale for probable cause to search scenarios?" He argues that the delay in this case "far exceeds any pre-existing Tennessee delay for probable cause." Thus, he contends that probable cause did not exist because the information used to obtain the warrant was stale. The State counters that pornographic images stored on a computer are capable of being maintained indefinitely, that the place to be searched was the Defendant's residence, and that the information relied upon for issuance of the search warrant was not stale.

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. The protections of Article I, Section 7 of the Tennessee Constitution are coextensive with those of the Fourth Amendment. *State v. Tuttle*, 515 S.W.3d 282, 307 (Tenn. 2017).

In Tennessee, a search warrant must be issued on a finding of probable cause and supported by an affidavit that "sets forth facts tending to establish" probable cause. T.C.A. §§ 40-6-103, -104; *see State v. Williams*, 193 S.W.3d 502, 506 (Tenn. 2006). "Probable cause generally requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *Williams*, 193 S.W.3d at 506 (citing *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999)). The issuing magistrate should use common sense when determining whether the affidavit supports a finding of probable cause. *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005). In this regard, the magistrate must determine, based upon all the information before him, where a fair probability exists that contraband or evidence of a crime will be discovered in the location to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In assessing the factual assertions contained in the affidavit, the magistrate must determine whether a substantial basis exists to support probable cause based upon the totality of the circumstances. *Tuttle*, 515 S.W.3d at 300. We review an issuing magistrate's probable cause determination with great deference. *Id.*; State *v. Melson,* 638 S.W.2d 342, 357 (Tenn. 1982) (citing *United States v. Melvin*, 596 F.2d 492, 498 (1st Cir. 1979)).

Our standard of review in determining whether a search warrant is based upon probable cause is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993). "In reviewing the existence of probable cause for issuance of a warrant, we may consider only the affidavit and may not consider any other evidence known by the affiant or provided to or possessed by the issuing magistrate." *Carter*, 160 S.W.3d at 533; *see Tuttle*, 515 S.W.3d at 299. A supporting affidavit must establish a

nexus between the criminal activity, the place to be searched, and the things to be seized. *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002)). "Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." *Reid*, 91 S.W.3d at 275.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

On appeal, a reviewing court considers only the affidavit and not any other evidence known by or provided to the issuing magistrate. *Tuttle*, 515 S.W.3d at 299. The reviewing court must determine "whether the evidence viewed as a whole provided the magistrate with 'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *Id.* (quoting *State v. Jacumin*, 778 S.W.2d 430, 432 (Tenn. 1989) *overruled on other grounds by Tuttle*, 515 S.W.3d at 307)).

The question of staleness of the information in the affidavit accompanying a search warrant is made on a case-by-case basis. *State v. Norris*, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000); *Meeks*, 876 S.W.2d at 124. In determining whether the lapse of time between criminal activity and the issuance of a warrant may affect the likelihood that incriminating evidence will be discovered if a warrant is issued, the magistrate "should consider whether the criminal activity under investigation was an isolated event or of a protracted and continuous nature, the nature of the property sought, and the opportunity those involved would have had to dispose of incriminating evidence." *Meeks*, 876 S.W.2d at 124-25 (citing *Sgro v. United States*, 287 U.S. 206, 210-11 (1932)). As a general principle, information regarding ongoing criminal activity does not become stale due to the passage of time. *Norris*, 47 S.W.3d at 470 (citing *State v. Thomas*, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991)).

The affidavit used to obtain the search warrant in this case contains two types of identifying information: the nature of the evidence sought and the location where it was believed to be stored. With regard to the nature of the evidence sought, this court has observed that "'child pornography is not a fleeting crime.'" *Robert D. Ewing*, 2014 WL

2609463, at *6 (quoting *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009); *see Domnick Doria*, 2016 WL 1694120, at *11. Rather, the collection and sharing of child pornography is of a continuous and ongoing nature and typically remains in possession of the user for an extended period of time." *Robert D. Ewing*, 2014 WL 2609463, at *7.

The Defendant argues that the age of the information in this case far exceeds that which was determined not to be stale in *Robert D. Ewing* and *Domnick Doria*. In *Robert D. Ewing*, the search warrant was not issued until approximately four months after the evidence of incriminating activity involving child pornography was discovered. *See id.* at *6. Similarly, in *Domnick Doria*, this court affirmed the trial court's determination that a delay of approximately three months between the discovery of incriminating activity involving child pornography and the issuance of a search warrant did not render the information too stale to support probable cause. *Domnick Doria*, 2016 WL 1694120, at *11. Our review of these cases reveals nothing that establishes three to four months as the point beyond which staleness occurs.

Aside from *Robert D. Ewing* and *Domnick Doria*, Tennessee decisions on staleness in the child pornography realm are limited; however, federal cases provide additional guidance. For example, in *Paull*, the Sixth Circuit affirmed the denial of a motion to suppress evidence obtained pursuant to a search warrant which had been issued based upon information that the defendant had subscribed to a child pornography website thirteen months before the search. 551 F.3d at 522. In *United States v. Frechette*, a case cited by the trial court in its order denying the motion to suppress in the present case, the court held that information of the defendant's subscription to a child pornography website was not stale such as to deprive the authorities of probable cause for a search warrant, despite the passage of approximately fifteen months between the criminal activity and the search. 583 F.3d at 377-79. Likewise, in *United States v. Gillman*, 432 Fed. Appx. 513, 515 (6th Cir. 2011), the court held that information regarding child pornography was not stale when used to obtain a warrant five months after the illegal activity involving the defendant's IP address occurred.

Regarding the question of staleness relative to the location where the evidence was stored, that is, the Defendant's apartment, we note that the affidavit stated that the specified IP address was identified as a potential download source of twenty-nine files of interest in a child pornography investigation, that the affiant downloaded a file containing child pornography from the IP address, that the Defendant was identified as the internet subscriber assigned to the IP address, and that physical address associated with the Defendant's internet subscription was the one identified in the affidavit as the location to be searched. The affidavit stated, as well, that the affiant believed "a user of a computer" at the specified physical address had a collection of child pornography which was being shared online. Although the Defendant argues that the information regarding his living at the address was stale, he has cited no authority to support his argument relative to the

length of apartment leases as affecting staleness of information of criminal activity and, thereby, probable cause.

In reviewing Fourth Amendment issues relative to questions of staleness, federal courts have considered whether (1) the character of the crime as an isolated offense or a continuing course of conduct, (2) whether the Defendant was nomadic or residential, and (3) whether the location to be searched was a secure operational base or a forum of convenience. *See United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010); *United States v. Maclin*, 393 F. Supp. 701, 710 (N.D. Ohio 2019).

According to the affiant, the Defendant had purchased internet service at the specified address, which indicates that the Defendant was residential and not nomadic as to the location, and because the location was his home, that it was a secure operational base. The information in the affidavit indicated that the IP address was associated with the residential address. It is a reasonable conclusion that a person who leases an apartment and purchases utility services, such as internet, intends to reside at the address for an extended period of time. Although the State alleged in a memorandum filed with the trial court that the affiant checked with the apartment complex's manager the day before the search to confirm that the Defendant still lived there, this information is beyond consideration in the probable cause analysis because it was not included in the affidavit. *See Carter*, 160 S.W.3d at 533; *see Tuttle*, 515 S.W.3d at 299.

Upon review of the totality of the circumstances, in connection with relevant state and federal authorities, we conclude that the trial court in the present case did not err in its determination that the information in the affidavit was not stale and that probable cause existed for the issuance of a warrant. The specified IP address was used for downloading and sharing child pornography, which by its nature is an ongoing crime. The IP address was assigned to the Defendant, who was the internet service subscriber at the location to be searched. The Defendant is not entitled to relief on this basis.

## II

### Right to Confront Accuser

The Defendant contends that he was denied his right to confront his accuser face-to-face, in violation of the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution. He argues that, based upon the physical layout of the courtroom, he was unable to see the victim seated on the witness stand. The State responds that the Defendant's right to confront his accuser was not abridged. We agree with the State.

The victim, who was age fourteen at the time of the trial, testified that the Defendant began touching her "lower spots" when she was around age five or six. She said he touched her with his hands and his "lower spot" on her clothes and on her skin. She said he made her touch his "lower front spot" with her hands. She said he touched her "lower front part" with his tongue when she was age six or seven. She said the touching occurred "a lot" and stopped when she moved to another state. She said the Defendant photographed her while making her touch his "lower part." She said he took photographs of her by herself and thought he took photographs of her clothed and unclothed. She said he photographed her "[v]ery often." She identified the Defendant by the nickname "Care Bear," which other evidence showed was the owner listed in the computer that had been seized during the search of the Defendant's apartment. The victim denied that her mother had sexually assaulted her and taken sexually explicit photographs of her. The victim acknowledged that, after her mother lost custody of her, she continued to visit her mother secretly until her father found out, but she denied that she and her mother discussed the criminal case. The victim denied that her mother had told her that if the victim "blamed everything" on the Defendant when the victim testified, the victim's mother's charges would be dismissed.

Before the victim took the witness stand at the trial, defense counsel advised the trial court that, due to the angle of the witness chair, the person seated in the chair could not be seen from the defense table. Defense counsel stated, "I . . . haven't seen a single witness this entire trial." Counsel stated that if a witness sat close to the wall between the witness stand and the court's bench, counsel could not see the witness. The court stated that counsel could "move over beside" the Defendant and "move the side of the table" but that the Defendant could not move to the other side of the courtroom. Counsel and the Defendant were permitted to move, and counsel advised the court that both could see the witness stand from their respective locations.

Early in the victim's direct examination, the prosecutor stated, "I saw you do a hand gesture, and the only problem with that is, the lady in front of you can't write that down, okay?" The prosecutor then asked the victim if the Defendant was in the courtroom, and she replied that he was. Defense counsel immediately advised the trial court during a sidebar conference that the victim had moved close to the wall between the witness stand and the bench, that "our" view was obstructed, and that he had been advised that the victim had pointed during her testimony but that he had been unable to see it. The court stated that, during the lunch break, it would "play with moving the furniture." The court noted that defense counsel had not complained about the Defendant's having been unable to see previous witnesses, and counsel responded that the Defendant had been able to see the previous witnesses. The court stated that counsel could move "back over behind" a court officer and that the Defendant could move to another seat at the defense table but could not move to another part of the courtroom. Counsel advised the court, "It's not going to help the matter. It's just she's tucked up

-8-

close to the wall and he can't see . . . through your bench." Counsel again stated that the witness had pointed "evidently" and that he had been unable to see it. He stated, however, that the Defendant had seen it. The court stated that the Defendant could sit anywhere in "the entire right side of the courtroom."

In a jury-out hearing after the victim's testimony, defense counsel requested that the victim return to the stand "to find out if she was instructed . . . to hide out of [the Defendant's] view[.]" The prosecutor stated that she advised the victim that the victim did not have to look at the Defendant but did not tell the victim to hide and never heard anyone else tell the victim to hide. The prosecutor said, "We were instructed she had to move over. The seat was moved over. She came in and sat there." The prosecutor said the victim-witness coordinator had advised the victim of where the victim should sit. The prosecutor said that she had not seen the victim move the witness chair but that the victim "obviously did."

The victim returned to the witness stand for the out-of-jury hearing and testified that, before her previous testimony, she had been in the courtroom with her stepmother and "Donita Cavalot." The victim said her stepmother stood at the defense table in order for the stepmother to determine whether the Defendant would be able to see her. She agreed she had been told she was allowed to move her chair closer to the wall in order to prevent the Defendant from seeing her. She was not asked who told her this. The victim agreed she had been told she did not have to look at the Defendant. She agreed she had been told "the first time [she] came in [the courtroom]" that she could "scoot over so that [she] didn't have to look at him." She also agreed that when she "came back in," she had been told she had to leave her chair "right here," which she later described as "in the middle." She said no one told her she could scoot over to keep the Defendant from looking at her. She said no one told her she could "hide" from the Defendant but someone told her she could "move over a little" in order not to have to look at the Defendant. She said that from where she sat at the time of the jury-out hearing and from where she sat when she testified in front of the jury, she could see the Defendant. She said that from where she sat during the jury-out hearing, she could see the Defendant if she turned her head.

Defense counsel informed the trial court that he could not see the victim. The court stated that the victim was sitting in the same location as when she testified previously. The court stated that the courtroom "sometimes . . . present[s] a challenge." The court stated, "And I'm not going to address the propriety of instructing witnesses where they can locate their chairs when they testify. That's not an issue." The court stated its intent to seek funding to move the podium and tables in order to avoid future issues.

Following a recess, the trial court made the following findings:

During the break we examined, for lack of a better description, the logistics or sight lines available in the courtroom, myself and the Court Officers, together with Ms. Alexander, and the witness and any individual seated in the chair.

For purposes of the record, we have two tables that are fashioned together, where they form a right-angle. One table has the back to the Gallery. The table that's pulled up to a 90-degree angle has its long side or back to the wall, and there's a total of four chairs, two on each side of the table.

It is possible for a witness then to see an individual who is seated in the chair, which has its back to the wall and is closest to the Gallery.

At one point during the testimony of [the victim], the Defendant was seated in that chair, which has its back to the wall and I think he then moved to the chair that he's currently in.

In any event, now, granted it's not an easy line of sight, but it is possible to see the witness by stretching your neck.

The Defendant alleged in the motion for a new trial that he was deprived of his constitutional right to confront the victim. At the hearing on the motion, the Defendant testified that he had been unable to see the witness stand during the trial. He identified a photograph that had been taken during the trial and said it accurately demonstrated his visual perspective during the trial. The photograph, which was received as an exhibit, showed that the stationary podium was located such as to create a narrow viewing area for individuals seated at the defense table to see the witness stand. In addition, an unidentified individual, whom we presume was a court reporter or court clerk, sat in front of the bench at an angle that further narrowed the view of the witness stand from the defense table. The Defendant agreed that, at some point during the trial, he was "raised up on" his knee in order to see better. He said that he was aware the victim "may have used a gesture" during the trial but that he had been unable to see it.

In its order denying the motion for a new trial, the trial court made the following findings of fact and conclusions of law:

During the trial the defendant's 6th Amendment rights were not violated. The Confrontation Clause does not guarantee a criminal defendant an absolute right to *physical* confrontation with a witness. In this case, the defendant and his attorney were permitted to move the table during a break.

-10-

Further, the defendant was advised that he could move his chair to a different location [at] the table which would have allowed for a different view of the minor victim. Ultimately the defendant chose not to move. The witness was present in the courtroom, provided testimony[, and] was subject to cross examination. The defendant's 6th Amendment rights were in no way violated.

. . .

The Court further finds that the proof in the case was overwhelming. The victim testified and identified the defendant. Computers containing child pornography were found in the possession of the defendant with login information relating to the defendant and witnesses testified regarding said evidence.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Likewise, Article I, Section 9 of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." The Supreme Court has condemned the use of a screen to shield a child victim of sexual assault from a defendant during the victim's testimony. *Coy v. Iowa*, 487 U.S. 1012 (1988). The requirement that the Defendant physically be able to see a witness in the courtroom is not absolute, however. The Supreme Court has said that the use of a child's testimony by closed-circuit television may be appropriate in limited circumstances. *Maryland v. Craig*, 497 U.S. 836 (1990). In Tennessee, our supreme court has upheld a statute permitting admission of recordings of forensic interviews of child sexual abuse victims on the basis that the admission of evidence of this nature does not violate a defendant's right to confront the witness. *State v. McCoy*, 459 S.W.3d 1 (Tenn. 2014).

The Defendant's argument turns less on the law regarding confrontation than on the facts of the case. He argues that he could not see the victim and that the victim was instructed to hide from the Defendant. The trial court in the present case found that the Defendant had been seated in a chair from which the witness stand could be seen and that the Defendant had moved voluntarily to another chair at some point during the victim's testimony. The court also found that the Defendant had been afforded the opportunity to move the defense table and to sit in a different chair. The court found, as well, that the Defendant had been present in the courtroom during the victim's testimony and that he had been afforded the right to cross-examine her. The court rejected the Defendant's allegation that the victim had been instructed to hide from the Defendant by positioning herself where he could not see her. The photograph exhibit introduced during the Defendant's testimony at the motion for a new trial shows a less-than-ideal courtroom

-11-

configuration; however, it supports the trial court's finding that the Defendant was not deprived of the opportunity to confront the victim face-to-face during her testimony. The court's factual findings support its conclusion that no constitutional violation occurred. The Defendant is not entitled to relief on this basis.

In reaching this conclusion, we have considered *State v. Edward Foy, Jr.*, No. 1123, 1990 WL 799 (Tenn. Crim. App. Jan. 9, 1990), *perm. app. denied* (Tenn. May 14, 1990), which the Defendant contends is relevant to a "blocked vison confrontation problem." *Edward Foy, Jr.*, dealt with the admission in a criminal prosecution of a physician's deposition, despite the Defendant's not having been present when the deposition was taken. In our view, *Edward Foy, Jr.*, is factually distinguishable and does not provide guidance in the present case.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE