# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 14, 2017 Session

## STATE OF TENNESSEE v. JEFFREY A. JONES

**Appeal from the Circuit Court for Williamson County**
**No. I-CR160015     Joseph A. Woodruff, Judge**

**No. M2017-00577-CCA-R3-CD**

FILED

MAR 2 7 2018

Clerk of the Appellate Courts
Rec'd By _____

The Defendant, Jeffery A. Jones, pled guilty in the Williamson County Circuit Court to DUI .08 % or greater, reserving as a certified question of law whether the results of his forced blood draw should have been suppressed because the affidavit in support of the search warrant contained reckless falsities and the form nature of the search warrant and affidavit prevented the magistrate from making an informed judgment as to probable cause. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robbie T. Beal and Erin W. Nations, (on appeal); and Ernest W. Williams (at trial), Franklin, Tennessee, for the appellant, Jeffrey A. Jones.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Tristan R.P. Poorman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Shortly after midnight on July 24, 2015, Deputy Gregory Wilhelm of the Williamson County Sheriff's Office stopped the Defendant for driving with a broken headlight. He detected the odor of alcohol emanating from the Defendant's vehicle and person and observed a cup of amber-colored liquid underneath the passenger seat. In

addition, the Defendant, whose eyes were "bloodshot" and "watery," fumbled for his insurance and registration, swayed and lost his balance as he exited his vehicle, and was "slow-speaking with a slight slur" as he answered the deputy's questions. After the Defendant failed the horizontal gaze nystagmus test and refused to participate in any further field sobriety tests, Deputy Wilhelm placed him under arrest for DUI and obtained a search warrant for a blood draw, which was executed at the hospital. The Defendant was subsequently indicted by the Williamson County Grand Jury for one count of DUI and one count of DUI .08 % or greater, both Class A misdemeanors.

On March 18, 2016, the Defendant filed a motion to suppress the results of his blood draw on the basis that it violated his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure. Specifically, he alleged that the preprinted form nature of the affidavit in use in Williamson County was insufficient to establish probable cause and that it was obvious from the videotape of the traffic stop that the information checked by the deputy was incorrect.

At the initial April 28, 2016 suppression hearing, Williamson County Magistrate Tim Cotton testified that he read the affidavit before he made his determination as to probable cause but did not question the deputy about his specific experience with DUI cases.

Deputy Wilhelm testified that he had handled several DUI stops during the three years he had been employed with the Williamson County Sheriff's Department. He had no previous law enforcement experience prior to being hired by the Williamson County Sheriff's Department. He said he completed six to eight weeks of field training, served as a patrol officer for six months, and then was assigned as a school resource officer. However, during all school breaks he was reassigned to midnight patrol. He did not know how many DUI stops he had made during his entire three years as an officer, but he recalled that he had made two DUI stops in the past three weeks. Deputy Wilhelm agreed that he marked on the form affidavit that the Defendant was "unsteady," "swaying," "staggering," and "heavy footed" and said that his interpretation of "heavy footed" is when someone "is unable to pick up [his or her] feet and take what a normal person would see as a normal step."

On cross-examination, Deputy Wilhelm testified that he had a reasonable basis to believe that the Defendant was unsteady, swaying, staggering, and heavy-footed and that all the information contained in the preprinted paragraphs of the affidavit detailing his training and experience was true. Upon questioning by the trial court, Deputy Wilhelm testified that, as he recalled, the Defendant exhibited a "very light sway from side to side" when he was speaking with the Defendant outside his vehicle. He further testified that he

based his characterizations of the Defendant's balance and gait on having watched the Defendant walk "[b]etween his vehicle and the vehicle that was equipped with a camera."

A dashboard videotape of the traffic stop, which began with the Defendant standing at the rear of his vehicle, was admitted into evidence and the trial court took the matter under advisement in order to review the videotape. In an order issued on May 4, 2016, the court found that the videotape did not support Deputy Wilhelm's statements that the Defendant was unsteady, staggering, swaying, and thick-tongued. The court, therefore, ordered that the case be put back on the motion docket for the State to have the opportunity to offer further proof prior to the court's ruling on the motion.

At the July 1, 2016 continuation of the hearing on the motion to suppress, Deputy Wilhelm testified that when he approached the Defendant's vehicle, he observed that all the windows were rolled down and detected an odor of alcohol coming from the vehicle. Upon making contact with the Defendant, he detected a stronger odor of alcohol from the Defendant's person and observed that the Defendant appeared drowsy. The Defendant was "slow-speaking with a slight slur," and his eyes were "bloodshot, watery, pink and glassed over." He asked the Defendant some generic questions and for his license, registration, and insurance. As the Defendant was looking through "some assembly of documents" in search of his insurance, Deputy Wilhelm saw him twice skip over the insurance document before finally locating it. Deputy Wilhelm also observed underneath the passenger seat "adjacent to the center console" a cup containing an amber-colored liquid.

Deputy Wilhelm testified that because his vehicle was not equipped with a camera or audio, he requested that Deputy Robert Givens respond to the scene. When Deputy Givens arrived, he learned that the audio pack in Deputy Givens' vehicle was not working, so he asked Deputy Givens to watch the Defendant while he checked the Defendant's driver's license status and waited for a third deputy to arrive. He also told Deputy Givens about the cup he had seen underneath the passenger seat of the Defendant's vehicle.

Deputy Wilhelm testified that Deputy Givens came back to tell him that he had been unable to see the cup in the Defendant's vehicle. At that point, Deputy Wilhelm returned to the Defendant's vehicle and asked him to step outside. The Defendant "took a step out and continued leaning to his right, away from the vehicle towards the roadway, almost to the point where he swayed over, and threw his arms up, caught his balance and continued walking." Deputy Wilhelm stated that Deputy Givens' dashboard camera, without audio, recorded the Defendant's exit from the vehicle, although Deputy Givens, who was walking back and forth monitoring traffic, blocked part of the scene. He

- 3 -

identified the videotape recorded from Deputy Givens' vehicle, which was admitted as an exhibit and played before the court.

Deputy Wilhelm testified that when he questioned the Defendant about the cup underneath the seat, the Defendant reported that it contained water. He said he then asked the Defendant if he would perform field sobriety tests, and the Defendant agreed. He explained that the video introduced at the previous hearing, recorded by the third deputy's dashboard camera, showed the Defendant's initial attempts at the field sobriety tests and his subsequent refusal to continue with the tests. He testified that after he administered the horizontal gaze nystagmus test to the Defendant, he had the Defendant assume the starting position for the "walk-and-turn task." However, before he could finish his explanation of the task, the Defendant began to walk. The Defendant also began complaining that he was walking "up or down a ramp," despite the fact that the ground was level. Deputy Wilhelm asked the Defendant to step back so that he could complete his instructions, and, at that point, the Defendant refused to continue with the tests.

Deputy Wilhelm testified that after he had placed the Defendant under arrest, he and his fellow deputies returned to the Defendant's vehicle, where they found that the cup he had earlier observed had spilled underneath the seat. He said that the odor of alcohol was even stronger in the vehicle and that the cup itself smelled of alcohol.

When questioned on cross-examination about his level of experience with DUI stops, Deputy Wilhelm testified that he had checked his records since the last hearing and discovered that prior to the instant case, he had three cases in which he had been the primary patrol officer. However, he had also been the secondary officer on "an unknown number of stops" and had "observed countless DUI stops" during his time as an "Explorer," prior to his employment with the sheriff's department. He said that the only things left in the cup when it was retrieved from the Defendant's vehicle were ice and grapes.

Deputy Robert Givens testified that he saw the Defendant appear to stumble and raise his hands upon his exiting the vehicle. He was unable to hear the Defendant's conversation with Deputy Wilhelm and, once he saw that the Defendant was not going to cause trouble, turned his attention to traffic. He later helped search for the cup that Deputy Wilhelm had seen in the Defendant's vehicle and discovered it spilled on the floorboard under the passenger side seat. The cup smelled of alcohol and appeared to contain ice and grapes.

The Defendant subsequently pled guilty to count 2 of the indictment, DUI .08% or greater. Pursuant to the terms of his negotiated plea agreement, count 1 was dismissed, and the parties agreed to the following certified question of law:

> Whether the form nature of the Search Warrant and Affidavit violate[s] the Defendant's Constitutional right in that it precluded the Magistrate from making an informed judgment of probable cause AND whether said warrant for Defendant's blood contained reckless falsities, without which, the warrant was void of probable cause.

## ANALYSIS

The Defendant contends that the affidavit was insufficient to establish probable cause for the search warrant because the form nature of the paragraphs regarding the officer's training and experience with DUI arrests deprived the magistrate of the opportunity to make a neutral and detached judgment. He further contends that the affidavit contained recklessly false statements regarding the Defendant's balance, walk, and speech, as evidenced by the videotapes of the stop, and that without those reckless falsities, the affidavit was insufficient to establish probable cause.

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998).

The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton , 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan , 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. Amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable

cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." Id. The affidavit must contain more than mere conclusory allegations on the part of the affiant. Id. However, a finding of probable cause made by an issuing magistrate is entitled to great deference. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983)). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993) (citation omitted).

A false statement in an affidavit may be sufficient to invalidate a search warrant, as our supreme court explained in State v. Little, 560 S.W.2d 403 (Tenn. 1978):

> [T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

Id. at 407. "In order to be 'essential to the establishment of probable cause,' the false statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." State v. Norris, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000) (citing State v. Tidmore, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980)).

In the trial court's detailed written order denying the motion to suppress, it found, among other things, that the "form nature" of the affidavit neither infringed on the Defendant's constitutional rights nor prohibited the magistrate from making a neutral and detached judgment of probable cause. Specifically, the court concluded that the validity of the statements detailing the officer's experience was not nullified merely because the affiant did not "personally construct the sentences on the document." The court noted that Deputy Wilhelm swore to the veracity of each of the statements appearing on the affidavit and that his account of the circumstances of the stop was corroborated by the testimony of Deputy Givens. The court further concluded that even if it disregarded the

- 6 -

form paragraphs that dealt with the officer's training and experience, the remaining portions of the affidavit provided more than enough probable cause for issuance of the search warrant. Finally, the court rejected the Defendant's claims of "reckless falsities" in the affidavit, finding that the videotape introduced at the second hearing date "provide[d] sufficient context and documentation supporting the facts within the affidavit."

The record supports the trial court's findings and conclusions. Deputy Wilhelm affirmed that each of the statements in the affidavit was true and explained that, in addition to the three prior DUI stops on which he was the primary officer, he had undergone training in DUI detection and participated as either a secondary officer or an Explorer in countless other DUI stops. He also explained that his checking of the boxes labeling the Defendant as "stumbling," "swaying," and "heavy footed" was primarily based on his observations of the Defendant when he stood from his vehicle, swayed and almost lost his balance, and walked from his driver's door to the rear of his vehicle. The videotape recorded by Deputy Givens' vehicle supports the officer's testimony, in that it shows the Defendant exiting his vehicle and, immediately upon standing, throwing his arms up in the air in what appears to be a balance-catching maneuver.

Moreover, as noted by the trial court, Deputy Givens corroborated Deputy Wilhelm's account of the Defendant's having lost his balance when he first exited his vehicle. Deputy Givens also corroborated Deputy Wilhelm's account of the alcohol smell in the vehicle and in the cup, which contents had spilled onto the floorboard of the vehicle. We conclude, therefore, that the affidavit contained sufficient information to establish probable cause for the search. Accordingly, we affirm the trial court's denial of the motion to suppress the results of the Defendant's blood draw.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE